**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 36211**

| | |
|---|---|
| STATE OF IDAHO, ) | |
| ) | **2011 Opinion No. 13** |
| Plaintiff-Respondent, ) | |
| ) | **Filed: March 25, 2011** |
| v. ) | |
| ) | **Stephen W. Kenyon, Clerk** |
| STACEY LEWIS GROVE, ) | |
| ) | |
| Defendant-Appellant. ) | |
| ) | |

Appeal from the District Court of the Second Judicial District, State of Idaho, Nez Perce County. Hon. Carl B. Kerrick, District Judge.

Judgment of conviction for first degree felony murder, <u>affirmed</u>.

Molly J. Huskey, State Appellate Public Defender; Diane M. Walker, Deputy Appellate Public Defender, Boise, for appellant. Eric D. Fredericksen argued.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

---

GUTIERREZ, Judge

Stacey Lewis Grove appeals from the judgment of conviction entered upon a jury verdict finding him guilty of first degree felony murder, by aggravated battery of a child under twelve years old. For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

Stacey Grove was indicted for the first degree felony murder of K.M., his girlfriend's twenty-three-month-old son, who was beaten and died as a result of his injuries on July 11, 2006.

K.M. was the son of Lisa N. ("Lisa") and Todd M. ("Todd") who had ended their relationship when K.M. was under a year old. Todd and Lisa had a turbulent relationship and engaged in a custody battle over K.M. In approximately April 2006, Todd was granted overnight visits with K.M. At some point in 2006, Lisa and Grove became romantically involved and Grove moved into the house Lisa shared with K.M. and her young daughter in Lewiston.

1

On July 7, 2006, it was observed that K.M. was not acting normally and that he appeared lethargic and "puny."  Lisa's mother took him to the doctor, but nothing of significance was found.  That evening, Lisa brought K.M. home, but Grove was absent from the house overnight and was never around K.M.  The next morning, Todd's wife picked up K.M. for an overnight visitation.  Lisa and Grove went on a recreational outing and Lisa's daughter was with a relative in Oregon.

At approximately 4 p.m. on July 8, Todd and his wife decided it was necessary to take K.M. to the emergency room, where they expressed concerns about a sore on K.M.'s nose and several bruises on his jaw and one under his armpit and requested that Child Protection Services (CPS) be called.  A doctor examined K.M. and called CPS who consulted with the family.  K.M. left the hospital with his father and stepmother at approximately 7:10 p.m.

On July 9, Todd returned K.M. to Lisa who proceeded to bathe K.M.  She testified that K.M. was continuing to act ill and wanted to be held for a prolonged period, which was unusual. When K.M.'s older sister arrived home, K.M. was excited to see her and briefly acted more lively.  He opened a gift from his sister and the two played with a balloon.  At dinner K.M. exhibited a normal appetite, but after dinner he acted tired and declined to color in a book his sister had provided to him.  Lisa put him to bed an hour early.

The next morning, Monday, July 10, Lisa awoke at approximately 5:15 a.m. and checked on K.M.  She found him awake, laying on his back with his eyes open, and noticed there was dry vomit in the bed.  Lisa put K.M. in the bathtub and noticed that he was "very, very pale" and, unlike his usual behavior, did not enjoy his bath.  K.M. was placed on Lisa and Grove's bed where he watched cartoons and, according to Grove, again attempted to throw up and his lips turned purple.  Because she was the only one who could open the building, Lisa left K.M. with Grove and took her daughter with her to work, planning to come home as soon as she could.

After arriving at work, Lisa noticed that Grove had called and she returned his call at approximately 7:54 a.m.  Grove told her that K.M. was worse than when she had left, he was worried about K.M., and he wanted Lisa to come home.  Lisa spoke to her son and told him she loved him to which he responded "I too."  Lisa testified that K.M. sounded "droopy" on the phone.

At around 8:20 a.m., a hysterical Grove called Lisa and demanded that she come home immediately.  He told her that K.M. was not breathing right and that he was getting him ready to

take him to the doctor. Lisa arrived home approximately ten minutes later. When she entered, K.M. was laying on the floor on a blanket, struggling to breathe. He appeared to be having convulsions and his eyes were rolling back into his head. Lisa called 911 at 8:54 a.m.

After arriving at the home, paramedics immediately transported K.M. to the hospital where Dr. Jay Hunter quickly diagnosed him as having a severe head injury, which he characterized as "shaken baby syndrome" that occurred in the last twenty-four hours. After Dr. Hunter determined that K.M. needed more specialized care than the hospital could provide, he was taken by helicopter to a hospital in Spokane. At approximately 3 p.m., doctors informed Lisa that K.M. was not going to survive. He was declared brain dead on July 11 at 9:20 a.m., the date on which his death certificate indicates was his date of death. Cardiac death occurred on the morning of July 12 when the organ donation procedure was performed.

The night of July 12, Grove and Lisa stayed at Grove's father's house during which time Grove tearfully told Lisa that something had happened to K.M. while he had been watching him on July 10. Lisa loudly asked Grove what had happened, causing Grove's father and stepmother to enter the room. Grove told them that he had placed K.M. on the counter, left him there to go get a brush, and K.M. had fallen off.

Approximately six months later, a grand jury indicted Grove for first degree felony murder, Idaho Code §§ 18-4001, 18-4002, 18-4003(d). Count 1 reads as follows:

> That the Defendant, Stacey L. Grove, on or about the 10th day of July 2006, in the County of Nez Perce, State of Idaho, did, during the perpetration of or attempt to perpetrate the crime of Aggravated Battery, on a child, to-wit: [K.M.], a human being, who was under the age of twelve (12) years, to-wit: approximately twenty-three months old . . . by striking him in the stomach and/or head and/or back and legs which caused abdominal bleeding, brain injury and musculature hemorrhaging from which he died.

At trial, both the state and the defense presented the testimony of several medical experts. The emergency room doctor, Dr. Hunter, testified that his opinions regarding K.M.'s condition had changed after reviewing the autopsy report. He first testified that he did not believe that K.M. had "simple" shaken baby syndrome and testified that his injuries were consistent with either being ejected from an automobile or being beaten very severely. Dr. Hunter also testified that based on the autopsy report, it was his opinion that K.M. would have been immediately symptomatic after being beaten--including having a severe headache and confusion--and would

3

have been close to unconsciousness. Thus, Dr. Hunter opined, K.M. could not have been fatally injured prior to the morning of July 10.

Dr. Marco Ross, who, at the time of K.M.'s death, was employed as the county's medical examiner and performed the autopsy of K.M.'s body, testified as the state's forensic pathologist. He stated that he had noted bruising on the body, several hemorrhages in K.M.'s brain and eyes and in other parts of his body, and internal bruising. Dr. Ross indicated that he removed K.M.'s brain, and consistent with his office's procedure, sent it to Dr. Ross Reichard, a neuropathologist at the University of New Mexico. He testified that Dr. Reichard performed an autopsy of the brain and sent a report of his findings and conclusions to Dr. Ross. Dr. Ross summarized Dr. Reichard's report, which indicated that K.M.'s brain showed a bilateral subdural hemorrhage, bilateral subarachnoid hemorrhage, and several other injuries as well as a laceration in the corpus callosum "which is a part of the brain that connects the two separate hemispheres of the brain[.]" Dr. Ross then testified that:

> [T]he laceration itself would sever some nerve bundles that travel between each side of the brain. And actually that injury, in and of itself, per se, may or may not have a lot of recognizable changes in a person who survives such as that.
> But what's more significant is the fact that--that a tear did occur is indicative of a degree of force that was impacted upon the head that an individual who sustained a laceration of the corpus callosum as a result of blunt force impact, you know, probably would have been rendered unconscious or nearly unconscious at the time of the impact.

Dr. Ross explained that according to Dr. Reichard's report, K.M.'s brain injuries showed a lack of inflammation and therefore would have been inflicted shortly before death. He also testified that applying the force necessary to lacerate the corpus callosum would likely have caused K.M. to become unconscious at the time of impact. He testified that based on his examination, all of the injuries, with the exception of a few bruises on K.M.'s lower back and jaw, were caused at approximately the same time--which was less than three to four days before K.M.'s cardiac death on July 11, and more likely one to two days before. He indicated that K.M.'s abdominal injuries would have immediately caused him debilitating pain and that his brain injuries would have rendered him almost immediately unconscious or nearly so. On this basis, he opined that K.M. could not have suffered such an injury prior to going to bed the night before based on the testimony from Lisa and others about K.M.'s physical activity that night and on Monday morning as those activities would have been impossible had K.M. already suffered the beating

4

which eventually caused his death. Dr. Ross specifically noted that K.M. would not have been able to speak on the phone with his mother.

On cross-examination, Dr. Ross testified that he had not performed any independent testing on K.M.'s brain. He testified that he would have generally been able to identify several of the hemorrhages, but not other injuries including a corpus callosum laceration which can only be identified through microscopic examination. Dr. Ross indicated that while it would be possible to review Dr. Reichard's findings by viewing the "recuts" with a microscope, he had not done so. He further testified that he did not recall if photographs had been taken of the tissues viewed by Dr. Reichard or whether he had reviewed any such photographs.

Based on his observations and the injuries described in Dr. Reichard's written report, Dr. Ross testified that it was his expert opinion that K.M.'s death was caused by homicide, specifically due to blunt impact injuries to his head which caused a subdural hemorrhage and secondary brain swelling. Again relying on Dr. Reichard's report, Dr. Ross concluded that the hemorrhages in K.M.'s brain were "acute," meaning that the injury likely occurred "sometime immediately before death or within a day or two prior to death." Because it was determined that K.M. was brain dead at 9:20 a.m. on July 11, Dr. Ross opined that Grove had been alone with K.M. during the window in which K.M.'s head injuries likely occurred--from around 7 a.m. to approximately 8:45 a.m. on July 10.

The state also called Dr. Deborah Harper, a Spokane pediatrician with special training in child physical and sexual abuse and neglect who had been called to the hospital to examine K.M. before he died. After first describing her own observations of K.M.'s injuries when she saw him, examining his records, and speaking to his mother, Dr. Harper testified that she had relied on the autopsy reports of Dr. Ross and Dr. Reichard (without specifically telling the jury what those reports contained) and the surgery notes from the organ harvest procedure to come to a conclusion about the cause of K.M.'s death and his physical manifestations of injury prior to his death. Regarding K.M.'s injuries, she opined that

> [K.M.] died as a result of two fatal injuries. The one that actually killed him first was the extremely serious brain injury that caused enormous brain swelling to the point that his brain pressure--the swelling was so great that the blood pumping from his heart could not get into the brain to feed the brain cells.
> In addition to that, the pressure on the brain was pushing down through the big hole at the base here where your spinal cord goes, so he had a herniation in

5

midbrain, which is really important for breath, and other things [were] being squished down through that.

In addition, he had really quite awful abdominal injuries. At the time of his organ harvest, the surgeon noted that he had bruising in his colon so the big-- that's the large bowel. He had bruising there and bruising in his small intestine as well.

And even more than that, the--the root--that's called the mesentery. But the root that holds your intestines in place, and it's a very strong tissue. It's like-- it's like really strong material, like canvas. And it's important because it holds the intestines where they belong so they don't get twisted up, and it--the blood vessels and nerves come through it. That had a rip in it. And that's just enormous force, and that was--we always suspect when children have a bad brain injury, they may have abdominal trauma. I was quite surprised myself at the extent of that major, major abdominal trauma that [K.M.] suffered.

When asked about her opinion as to when the injuries that caused his death occurred, she stated:

When these injuries occurred, he immediately looked awful. He would have been unconscious or semi-conscious, limp, not--probably not breathing well, perhaps still breathing at that time. But he would have immediately--on the blows that dealt these injuries, would have been obviously critically ill.

She also indicated her opinion that his behavior on the morning of July 10, as testified to by his mother and sister, was not consistent with having already received the injuries that would eventually kill him. She also opined that falling off the counter would not have caused the catastrophic injuries K.M. sustained, nor could such a fall have exacerbated an existing injury and caused it to become fatal because the type of injury that actually killed K.M. was a single injury that caused immediate swelling of the brain. Dr. Harper then addressed whether K.M. could have had a delayed response to the injuries to his brain--for example, a slow bleeding in his brain that would not have produced physical symptoms for a few days after the injury. When asked by the defense attorney whether she was aware that there are studies and reports in various medical journals indicating that there can be a delayed response to subdural hematomas, Dr. Harper answered:

There can be a delayed response to subdural hematomas. In [K.M.'s] case, he [had] subdural hematomas, which are interesting that they're there, but that wasn't his main brain injury. His main brain injury was actually to the physical solid part of his brain.

Grove called Dr. Jonathan Arden, a forensic pathologist based in Virginia, to testify as an expert. Dr. Arden testified that he had reviewed, among other things, the autopsy report, including the brain examination report prepared by Dr. Reichard, recuts of the microscopic slides of tissue from K.M.'s body and brain that had been used by Dr. Reichard and Dr. Ross in conducting the autopsy, and autopsy photographs. He testified that based on his review of these materials, he agreed with Dr. Ross that K.M.'s death was the result of homicide and caused by blunt impact injuries to his head--specifically referencing a subdural hemorrhage and brain swelling, but disagreed with Drs. Ross and Harper as to the timing of the injuries, stating that he believed that the significant injuries to K.M.'s head and abdomen had been inflicted at least three days prior to his death--on either July 8 or 9. He testified that his opinion on this matter had come largely from microscopic examination of relevant tissues and his observations as certain body processes which are used to date injuries.

Dr. Arden also testified that he disagreed with Dr. Reichard's conclusion that there was a laceration of the corpus callosum, rather he believed that what Dr. Reichard had perceived as a laceration was merely something that occurred during the processing of K.M.'s brain after his death. He testified that the existence of a laceration would have significant impact on whether a person would be rendered immediately unconscious or not. He testified that it was his opinion that K.M. could have engaged in all of the activities testified to--including, among other things, playing with his sister when she returned from her trip and sitting in his high chair and eating dinner--having already sustained the head injuries that would lead to his death.

Dr. Arden also opined that K.M. having thrown up in bed, being pale, and dry-heaving on the morning of July 10 are all possible symptoms of the type of head injury and abdominal injuries that Dr. Arden believed that K.M. had sustained and that it was reasonable that having sustained these injuries, K.M. would not have immediately shown symptoms and that his symptoms could have waxed and waned over a period of time. He did admit that if he assumed that the injuries had occurred on Monday morning (which he did not agree with due to his dating of the injuries through viewing the microscopic slides), it would have been consistent with his injuries for K.M. to become immediately unconscious. Dr. Arden further indicated his opinion that many of K.M.'s abdominal injuries were older and therefore there was no reason to conclude that K.M. would have been showing signs of being in excruciating pain from those injuries on July 8 or 9.

7

The jury found Grove guilty of first degree felony murder. Grove now appeals.

## II.

## ANALYSIS

On appeal, Grove raises two main issues--that his right to confrontation was violated by the testimony of Dr. Ross and Dr. Harper as to Dr. Reichard's findings and conclusions and that the district court erred in instructing the jury.

**A.      Right to Confrontation**

Grove contends that his Sixth Amendment right to confrontation[1] was violated when Drs. Ross and Harper testified as to Dr. Reichard's opinions concerning K.M.'s brain injuries, because Dr. Reichard did not testify at trial and therefore Grove had no opportunity to cross-examine him. It is undisputed that defense counsel did not object to either Dr. Ross's or Dr. Harper's testimony in this regard and thus we must examine whether it constitutes fundamental error such that we can review it for the first time on appeal.

Initially, we clarify that the crux of this issue affects the central disputed question in this case--when the injuries which ultimately caused K.M.'s death occurred and whether it was likely that K.M. would have lost consciousness and/or shown severe symptoms immediately after the injuries were inflicted. In other words, did the injuries occur on the morning that K.M. lost consciousness--and was alone with Grove--or several days prior, when it was undisputed that the injuries could not have been inflicted by Grove because he was not alone with K.M. In this regard, important to the state's theory of the case that Grove caused the fatal injuries on the morning of July 10 was the conclusion of Dr. Reichard, based on his microscopic examination of K.M.'s brain, that K.M. had suffered a laceration of the corpus callosum, which would have likely caused immediate loss of consciousness, thereby implicating Grove as the cause of K.M.'s injuries during the 36-45 minute period of time during which he was alone with K.M. Grove points out that both Dr. Ross and Dr. Harper recited Dr. Reichard's observations in this regard, as gleaned from the autopsy report, as neither was present during the autopsy nor conducted their own microscopic analysis, and relied on these observations in forming their respective opinions that K.M.'s injuries had been inflicted on July 10.

---

[1]      The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Davis v. Washington*, 547 U.S. 813, 821 (2006).

By contrast, Grove's expert, Dr. Arden, testified that he did not agree with Dr. Reichard that a laceration was present and that the anomaly was the result of handling of the brain after death. He also offered his opinion, after examination of the microscopic slides, that K.M.'s injuries had been inflicted at least three days prior to death (thus absolving Grove of having caused them) and that they would not have necessarily resulted in immediate loss of consciousness.

Generally, Idaho's appellate courts will not consider error not preserved for appeal through an objection at trial. *State v. Perry*, 150 Idaho 209, 224, 245 P.3d 961, 976 (2010); *State v. Johnson*, 126 Idaho 892, 896, 894 P.2d 125, 129 (1995). This limitation on appellate court authority serves to induce the timely raising of claims and objections, which gives the trial court the opportunity to consider and resolve them. *Puckett v. United States*, 129 S. Ct. 1423, 1428 (2009); *Perry*, 150 Idaho at 224, 245 P.3d at 976. Ordinarily, the trial court is in the best position to determine the relevant facts and to adjudicate the dispute. *Perry*, 150 Idaho at 224, 245 P.3d at 976. In the case of an actual or invited procedural error, the trial court can often correct or avoid the mistake so that it cannot possibly affect the ultimate outcome. *Id.* Furthermore, requiring a contemporaneous objection prevents the litigant from sandbagging the court, *i.e.*, remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor. *Id.* However, every defendant has a Fourteenth Amendment right to due process and it is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process. *Caperton v. A.T. Massey Coal Co., Inc.*, 129 S. Ct. 2252, 2259 (2009); *Perry*, 150 Idaho at 224, 245 P.3d at 976. Accordingly, when an error has not been properly preserved for appeal through objection at trial, the appellate court's authority to remedy that error is strictly circumscribed to cases where the error results in the defendant being deprived of his or her Fourteenth Amendment due process right to a fair trial in a fair tribunal. *Perry*, 150 Idaho at 224, 245 P.3d at 976.

Recently in *Perry*, our Supreme Court summarized the analysis which applies in cases of unobjected-to error:

> (1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's

9

substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*id.* at 226, 245 P.3d at 978 (footnote omitted).

Given that the Confrontation Clause violation issue complained of in this case implicates a constitutional right (a conclusion not disputed by the state), in determining whether we may address the issue on appeal, we first examine whether Grove has shown that the alleged error was "clear or obvious" and that there is no need for additional information on the record as to whether Grove's failure to object was a tactical decision.

In determining whether plain error exists here, we note that the *Perry* Court expounded on the "plain error" factor, stating that the error "must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision . . . ." *Id.* Initially, the state contends that we cannot find fundamental error, because Grove has failed to establish from the record that the lack of objection by Grove's trial counsel was not the result of a strategic decision to not object to evidence of the findings in the neuropathologist's report. Specifically, the state contends that the record indicates that the defense "tried to gain a tactical advantage" from the fact that Dr. Reichard did not testify at trial, noting:

> The very first thing the defense cross-examination of the state's pathologist established was that he had not independently reviewed the brain microscopically and was instead relying solely on the examination and findings of injury to the brain done by the neuropathologist in New Mexico. The defense later spent considerable effort to rebut the findings of injury in the neuropathologist's report based upon the defense expert's personal examination of tissue samples. The defense's expert pathologist testified that personal examination of the slides of the tissue sample in this case, which Dr. Ross had not done, was a "requirement . . . to do a competent job" and "essential to a fair and competent and accurate autopsy." At argument defense counsel contended that the testimony of the defense pathologist was more reliable than the testimony of the state's pathologist because the state's pathologist relied on the "faulty information" in the neuropathologist's report, that he did not "independently review" the tissue samples, and that only the defense expert did "due diligence" by showing the jury exactly how he came to his conclusions about brain injuries. If the defense had made an objection, and excluded the evidence of the findings in the neuropathological examination, it would have lost the tactical advantage of claiming that the state's pathologist was relying on "faulty information." Perhaps even worse for the defense would have been if its objection forced the state to call the neuropathologist to the stand to give testimony on why his examination was not "faulty."

(citations omitted). The state thus argues that because the record is insufficient to rule out the possibility that defense counsel's choice not to object was a tactical choice, Grove has failed to show fundamental error.

Idaho case law is not particularly developed on this issue, however in laying out the clarified fundamental error paradigm, the *Perry* Court cited to *State v. Adams*, 147 Idaho 857, 216 P.3d 146 (Ct. App. 2009) in a footnote as an example of a case where the defendant's failure to object was deemed to be a tactical decision. *Perry*, 150 Idaho at 226 n.5, 245 P.3d at 978 n.5. In *Adams*, the appellant contended that even though he had not tried to exclude the juror for cause or used a peremptory challenge, the district court had erred in failing to *sua sponte* remove a juror for cause for exhibiting bias where that juror had expressed some uncertainty at voir dire about whether she would "hold it against" the state or the defense if there were occasion where the jurors had to leave the room while the parties discussed a legal issue. On appeal, this Court first noted that to provide relief, the error must be fundamental and noted the limited nature of the fundamental error doctrine, recognizing that it is an exception, not the rule, and should not be "a mechanism for criminal defendants to obtain judicial review of every plausible claim of trial error." *Adams*, 147 Idaho at 861, 216 P.3d at 150. We then noted:

> Appellate courts should be particularly careful in applying the fundamental error doctrine to what may be a matter of legitimate strategic or tactical choices by defense counsel which generally cannot be discerned from the record on appeal. *See Mintun v. State*, 144 Idaho 656, 662, 168 P.3d 40, 46 (Ct. App. 2007). Decisions whether to challenge a potential juror for cause fall within that category. In assessing whether to challenge a particular juror, attorneys must not only weigh the perceived negative features against the favorable features of that particular juror, they must also consider whether eliminating the juror could result in an even less acceptable individual moving into that position on the jury panel. Here, the absence of a challenge to Juror 608 may have been a tactical decision by defense counsel, because although Juror 608 gave some problematical answers in voir dire, other factors may have led defense counsel to believe that she was, on balance, a person that he wanted on the jury or that she was more acceptable than another who might be substituted for her. After his conviction, and in hindsight, Adams now contends that the trial court should have intervened *sua sponte* to exclude the juror for cause. We are of the view that trial courts should not be required or encouraged, in any but the most extreme circumstances, to interfere with legitimate tactics of counsel by excusing for cause a juror who has not been challenged by either party. Therefore, we will not find fundamental error in such trial court inaction in the absence of a clear record that a potential juror would be so biased against a criminal defendant, or otherwise excludable for

11

> cause, that neither the trial court nor defense counsel could have reasonably allowed the juror to serve.

*id*. at 861-62, 216 P.3d at 150-51. We concluded that there was not a clear record in the case that the juror in question was so biased that neither the court nor defense counsel could have reasonably allowed her to serve--she did not indicate that she was biased against criminal defendants or in favor of the state and while she indicated that she resented the removal of jurors from the courtroom when attorneys' objections required discussion in absence of the jury and that she could not promise not to hold this against the state or the defense, this was an expression of resentment toward the system, not against the defendant. *Id*. at 862, 216 P.3d at 151.

Importantly in the context of this case, it is well established that counsel's choice of witnesses, manner of cross-examination, and lack of objection to testimony fall within the area of tactical, or strategic, decisions. *Giles v. State*, 125 Idaho 921, 924, 877 P.2d 365, 368 (1994). With this is mind, we conclude that we cannot ascertain from the record whether Grove's failure to object to Dr. Ross's and Dr. Harper's testimony as to Dr. Reichard's findings and conclusions was not a tactical decision--the record simply does not eliminate the possibility that the failure to object was strategic. In assessing whether to object in this instance, defense counsel would have not only had to weigh the best case scenario that the testimony would be excluded, but also the more likely possibility that a timely objection would have prompted the state to subpoena Dr. Reichard to "defend" his findings and conclusions. Had that occurred, anything short of the unlikely circumstance of Dr. Reichard admitting that he erred in his methods and/or findings would have resulted in diminishing the ability for Grove to argue that Dr. Reichard's findings were "faulty" and thus question the reliability of the testimony of each doctor that relied on the brain autopsy to come to the conclusion that the injuries must have been inflicted during the time that Grove was alone with K.M.--as he did at trial both through cross-examination of Dr. Ross and through the testimony of Dr. Arden. To refrain from objecting and instead attack Dr. Reichard's report *in absentia* is certainly a viable trial strategy, and thus we cannot say that it would not be reasonable for either the court or defense counsel to allow the testimony. As we noted above, our Supreme Court has made it clear that application of the fundamental error doctrine is to be limited, and we abide by that pronouncement and conclude here that Grove cannot challenge admission of the testimony for the first time on appeal.

12

**B.      Jury Instructions**

Grove argues that the district court erred in several respects in regard to the jury instructions.  Specifically, he contends that the court erred in instructing the jury on the requisite mental element for felony murder by failing to instruct the jury on malice aforethought or specific intent.  He also contends that the district court erred in failing to instruct the jury on the merger doctrine of felony murder and that the court created a fatal variance when it failed to limit the elements instruction for first degree murder to the factual allegations contained in the indictment.

It is undisputed that Grove did not object to any of these four issues before the district court.  Thus, as above, we must determine whether there existed fundamental error such that we may review the claims for the first time on appeal.  As indicated previously, to amount to fundamental error, the defendant must demonstrate that one or more of his unwaived constitutional rights were violated, that the error is clear or obvious without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision, and that the error affected the outcome of the trial proceedings.  *Perry*, 150 Idaho at 226, 245 P.3d at 978.

**1.      Malice aforethought instruction**

Grove contends that because the plain language of Idaho's homicide statutes define murder as an unlawful killing committed with malice aforethought, it was error for the jury not to be instructed that they must find malice aforethought to convict him of K.M.'s murder.  The state disagrees, contending that the law is clear that the intent element as encompassed by the felony murder statute requires only an intent to commit the underlying felony, not the intent to murder.

In this case, the elements instruction provided that:

> In order for the Defendant to be guilty of First Degree Murder, the State must prove each of the following:
> 1.      On or about July 10, 2006,
> 2.      in the State of Idaho,
> 3.      the Defendant, Stacey L. Grove, committed an aggravated battery upon [K.M.], a child under the age of twelve (12) years of age,
> 4.      which caused the death of [K.M.].
> If you find that the State has failed to prove any of the above, then you must find the Defendant not guilty of First Degree Murder.  If you find that all of

the above have been proven beyond a reasonable doubt then you must find the Defendant guilty of First Degree Murder.

In addition, the district court instructed the jury that "[a] person commits aggravated battery who, in committing battery, causes great bodily harm, permanent disability, or permanent disfigurement." The court also instructed the jury on the elements of battery:

> A "battery" is committed when a person:
> (1) wilfully and unlawfully uses force or violence upon the person of another;
> (2) actually, intentionally and unlawfully touches or strikes another person against the will of the other; or
> (3) unlawfully and intentionally causes bodily harm to another individual.

The jury was also instructed on the definition of "wilfully" which stated that "[a]n act is 'wilful' or is done 'wilfully' when done on purpose. One can act wilfully without intending to violate the law, to injure another, or to acquire any advantage."

Murder is defined in Idaho as "the unlawful killing of a human being with . . . malice aforethought . . . ." I.C. § 18-4001. Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." I.C. § 18-4002. Felony murder, of which Grove was convicted, is defined in I.C. § 18-4003(d) which provides that "[a]ny murder committed in the perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age . . . is murder of the first degree." Contrary to Grove's contention that the district court was required to instruct the jury as to malice aforethought, Idaho courts have consistently held that the intent necessary to commit the underlying felony (which in this case was aggravated battery on a child under twelve) substitutes for the malice element of murder. *See State v. Lundquist*, 134 Idaho 831, 835, 11 P.3d 27, 31 (2000); *State v. Pratt*, 125 Idaho 594, 598, 873 P.2d 848, 852 (1994); *State v. Dunlap*, 125 Idaho 530, 533-34, 873 P.2d 784, 787-88 (1993); *State v. Lankford*, 116 Idaho 860, 866, 781 P.2d 197, 203 (1989); *State v. Windsor*, 110 Idaho 410, 419, 716 P.2d 1182, 1191 (1985). Thus, it was not error for the court to fail to give a malice aforethought instruction, much less fundamental error. To the extent that Grove argues that the long line of cases upholding this proposition are wrongly decided, such an assertion is irrelevant in the context of fundamental error where the error must be plain under *current* law.

14

### 2. Specific intent instruction

Grove also argues that felony murder requires the "specific intent to commit the underlying felony" and therefore the district court erred in not instructing the jury that Grove had to have specific intent to commit an aggravated battery, specifically specific intent to cause "great bodily harm, permanent disability, or permanent disfigurement."

However, as the state points out and as Grove concedes in his appellant's brief, this exact argument has been rejected by this Court in *State v. Carlson*, 134 Idaho 389, 3 P.3d 67 (Ct. App. 2000). Carlson, like Grove, had been convicted of first degree felony murder by aggravated battery on a child under twelve. On appeal, Carlson asserted that in order to have been properly instructed, the jury should have been informed that to sustain a charge of first degree felony murder based on the aggravated battery of a child under twelve, the state was required to prove beyond a reasonable doubt that he possessed the specific intent to commit an aggravated battery. After examining the history of the felony murder statute, this Court concluded that there was nothing to suggest that the legislature intended the underlying felony of aggravated battery on a child under twelve to be a specific intent crime when it was the basis of a felony murder conviction. *Id.* at 400, 3 P.3d at 78. We explicitly held that in order to permit a conviction for felony murder for the aggravated battery of a child under twelve, a jury need only be instructed that the state needs to prove, beyond a reasonable doubt, that the perpetrator had the *general intent* to commit the underlying predicate felony. *Id.*

Grove contends, however, that *Carlson* is in conflict with *State v. Scroggins*, 110 Idaho 380, 716 P.3d 1152 (1985), which was recently reaffirmed by *State v. Pina*, 149 Idaho 140, 233 P.3d 71 (2010) and therefore *Carlson* was wrongly decided and should not be followed here. In *Scroggins*, the Court stated that "[i]n a prosecution for felony murder, the state is relieved of the burden of proving that a defendant had the specific intent to kill and instead need only prove that all individuals charged as principals had the specific intent to commit the predicate felony." *Scroggins*, 110 Idaho at 386, 716 P.2d at 1158. *Pina* reiterated the proposition, citing to *Scroggins*. *Pina*, 149 Idaho at 147, 233 P.3d at 78. However, as we pointed out in *Carlson*, the underlying felony in *Scroggins* was attempted rape and attempts are, by definition, specific intent crimes. *Carlson*, 134 Idaho at 401-02, 3 P.3d at 79-80. Thus, we concluded that the facts in *Carlson* were factually distinguishable from *Scroggins* and Carlson's reliance on *Scroggins* for the proposition that general intent crimes may not be utilized as the basis for felony murder was

misplaced. *Id.* at 402, 3 P.3d at 80. Similarly, the underlying felony in *Pina* was kidnapping, also a specific intent crime. I.C. § 18-4501; *State v. Peteja*, 139 Idaho 607, 612 n.4, 83 P.3d 781, 786 n.4 (Ct. App. 2003). Thus, we do not interpret *Scroggins* and *Pina* as setting forth a broad pronouncement that for any felony to be the predicate for felony murder, specific intent must be proven--it is evident that in both cases the Court was speaking in the context of cases where the underlying felonies always require specific intent. Put another way, there is no indication that the Court intended to alter the plain language of the aggravated battery statute by adding a specific intent element when it forms the basis of felony murder.

In addition, we note that in *Pina*, a key issue was whether Pina could be convicted of felony murder where the actual killing had been committed by a co-defendant and there was no evidence of a "common scheme or plan" between him and the killer to commit the underlying felony of kidnapping. Thus, the Court's comment regarding specific intent must be viewed in the context of the fact that the underlying felony was a specific intent crime *and* there existed the question of whether culpability for murder can extend to a co-defendant who did not actually "pull the trigger"--both issues which are not present in the instant case. Thus, we conclude that *Pina* and *Scroggins* are distinguishable from the case at bar, that *Carlson* controls the issue and therefore, under current Idaho law, the court's failure to instruct the jury on specific intent was not error.

### 3. Merger doctrine instruction

Grove contends that under the doctrine of "merger" which is applied in "a number of states," assaultive felonies "merge[] with the homicide and cannot be the basis of a felony murder instruction" and that the court erred in not instructing the jury as much. Idaho's felony murder statute as amended in 1991, however, explicitly includes aggravated battery on a child under twelve (12) years of age as a felony which can form the basis for first degree murder, the plain language of which is not trumped by a judicially created doctrine that is applied in states without a similar statute. *See Schultz v. State*, 749 P.2d 559, 561-62 (Okla. Crim. App. 1988) (noting that the legislature effectively overruled precedent applying the merger doctrine when it amended the felony murder statute to make the crime of unreasonable force upon a child a basis for felony murder). Thus, the merger doctrine is not the law in Idaho and therefore there is no error in not instructing a jury as to the doctrine.

16

### 4. Variance

Grove contends that there was a fatal variance between the elements instruction (quoted above) and the indictment charging him with first degree murder which stated:

> That the Defendant, Stacey L. Grove, on or about the 10th day of July 2006, in the County of Nez Perce, State of Idaho, did, during the perpetration of or attempt to perpetrate the crime of Aggravated Battery, on a child, to-wit: [K.M.], a human being, who was under the age of twelve (12) years . . . by striking him in the stomach and/or head and/or back and legs which caused abdominal bleeding, brain injury and musculature hemorrhaging from which he died.

Grove argues that the problem with the district court's elements instruction is that it did not limit the state, in its attempt to prove an aggravated battery, to the striking act described in the indictment--rather, he contends, the jury was instructed that it could find Grove guilty of first degree murder based on any alleged aggravated battery, either intentionally or negligently caused. He contends that this is "fatal" given that Dr. Hunter testified that his initial impression upon seeing K.M. at the emergency room was that he had suffered from "shaken baby syndrome" and that Grove had testified that K.M. had fallen from the counter on the morning of July 10. Thus, Grove reasons, the elements instruction allowed the jury to find that he had committed aggravated battery by shaking K.M. or by negligently allowing him to fall off the counter, which was contrary to the indictment that alleged that he had committed aggravated battery by striking K.M. in the stomach and/or head and/or back and legs--and he was not given notice of the possibility of having to defend against these scenarios. Grove concedes that he did not object to this alleged error below, and thus we must again determine whether there is fundamental error such that we may address the issue for the first time on appeal.

The existence of an impermissible variance is a question of law over which we exercise free review. *State v. Alvarez*, 138 Idaho 747, 750, 69 P.3d 167, 170 (Ct. App. 2003); *State v. Sherrod*, 131 Idaho 56, 57, 951 P.2d 1283, 1284 (Ct. App. 1998). Our task in resolving the issue presented is two-fold. First, we must determine whether there is a variance between the information used to charge the defendant and either the instructions presented to the jury or the evidence adduced at trial. *See State v. Brazil*, 136 Idaho 327, 329, 33 P.3d 218, 220 (Ct. App. 2001). Second, if a variance exists, we must examine whether it rises to the level of prejudicial error requiring reversal of the conviction. *Id.* A determination of whether a variance is fatal depends on whether the basic functions of the pleading requirement have been met. *Id.* at 330,

17

33 P.3d at 221; *State v. Windsor*, 110 Idaho 410, 417, 716 P.2d 1182, 1189 (1985). A charging instrument meets the basic functions of the pleading requirement if it fairly informs the defendant of the charges against which he or she must defend and enables him or her to plead an acquittal or conviction in bar of future prosecutions for the same offense. *United States v. Bailey*, 444 U.S. 394, 395 (1980); *Brazil*, 136 Idaho at 330, 33 P.3d at 221. A variance is fatal if it amounts to a "constructive amendment." *State v. Jones*, 140 Idaho 41, 49, 89 P.3d 881, 889 (Ct. App. 2003). A constructive amendment occurs if a variance alters the charging document to the extent that the defendant is tried for a crime of a greater degree or a different nature. *Id.*; *State v. Colwell*, 124 Idaho 560, 566, 861 P.2d 1225, 1231 (Ct. App. 1993). In sum, a variance between a charging document and a jury instruction or the evidence adduced at trial requires reversal only when it deprives the defendant of his substantial rights by violating the defendant's right to fair notice or leaving him or her open to the risk of double jeopardy. *State v. Wolfrum*, 145 Idaho 44, 47, 175 P.3d 206, 209 (Ct. App. 2007); *Brazil*, 136 Idaho at 330, 33 P.3d at 221; *Sherrod*, 131 Idaho at 59, 951 P.2d at 1286; *Colwell*, 124 Idaho at 566, 861 P.2d at 1231. A review of whether the defendant was deprived of his or her right to fair notice requires the court to determine whether the record suggests the possibility that the defendant was misled or embarrassed in the preparation or presentation of his or her defense. *Brazil*, 136 Idaho at 330, 33 P.3d at 221; *Windsor*, 110 Idaho at 418, 716 P.2d at 1190.

Here, even assuming without deciding that a variance existed, there is no plain error, because such a variance is not fatal. Grove contends that the variance was fatal, because he was denied fair notice to defend against assertions that he committed aggravated battery leading to the death of K.M. by shaking him or by negligently allowing him to fall off the counter. However, as we stated above, a defendant is only deprived of his right to fair notice if the record suggests the possibility that the defendant was misled or embarrassed in the preparation or presentation of his defense. *See id*. Such is not the case here--there was no evidence presented at trial that either of these actions were the cause of K.M.'s injuries--thus there was no reason for Grove to defend against them as the basis of his felony murder charge. The only reference to "shaken baby syndrome" by Dr. Hunter was his testimony that upon cursory examination of K.M. he had initially thought this was the cause of K.M.'s injuries, but he later changed that diagnosis after learning the full severity of K.M.'s injuries and indicated that K.M. did *not* have shaken baby syndrome. In regard to Grove's testimony that K.M. had fallen from the counter,

18

every expert that testified indicated that such a fall could *not* have caused the massive injuries suffered by K.M. which led to his death. Accordingly, Grove cannot show that a fatal variance existed such that there was fundamental error that we may review for the first time on appeal.

**C.      Cumulative Error**

Finally, Grove asserts that based on the fact that there were "three substantial errors" that occurred at trial, the doctrine of cumulative error applies and reversal for a new trial is required. Under the cumulative error doctrine, an accumulation of irregularities, each of which might be harmless in itself, may in the aggregate reveal the absence of a fair trial in contravention of the defendant's right to due process. *State v. Severson*, 147 Idaho 694, 723, 215 P.3d 414, 443 (2009). Since we have found that there was no fundamental error, the cumulative error doctrine is not applicable.

## III.

## CONCLUSION

Because there is not fundamental error, we will not address Grove's contention that his right to confrontation was violated by witness testimony as to the findings and conclusions of a non-testifying expert. Similarly, Grove has not shown fundamental error in the district court's instructing of the jury. Grove's conviction of first degree felony murder, by aggravated battery of a child under twelve years old, is affirmed.

Chief Judge GRATTON and Judge MELANSON **CONCUR.**