**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 43537**

| | | |
|---|---|---|
| **STACEY LEWIS GROVE,** | ) | **2017 Opinion No. 8** |
| | ) | |
| **Petitioner-Appellant,** | ) | **Filed: February 2, 2017** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **STATE OF IDAHO,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

Appeal from the District Court of the Second Judicial District, State of Idaho, Nez Perce County. Hon. Carl B. Kerrick, District Judge.

Judgment dismissing, in part and denying in part, petition for post-conviction relief, <u>affirmed</u>.

Nevin, Benjamin, McKay & Bartlett, LLP; Dennis Benjamin and Deborah Whipple, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent.

_____

GRATTON, Chief Judge

Stacey Lewis Grove appeals from the district court's judgment dismissing, in part and denying in part, Grove's petition for post-conviction relief. We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

This Court made the following summarization of the facts of this case in *State v. Grove*, 151 Idaho 483, 485, 259 P.3d 629, 631 (Ct. App. 2011):

> Stacey Grove was indicted for the first degree felony murder of K.M., his girlfriend's twenty-three-month-old son, who was beaten and died as a result of his injuries on July 11, 2006.
> K.M. was the son of Lisa N. ("Lisa") and Todd M. ("Todd"). Todd and Lisa had a turbulent relationship and engaged in a custody battle over K.M. In approximately April 2006, Todd was granted overnight visits with K.M. At some

1

point in 2006, Lisa and Grove became romantically involved and Grove moved into the house Lisa shared with K.M. and her young daughter in Lewiston.

On July 7, 2006, it was observed that K.M. was not acting normally and that he appeared lethargic and "puny." Lisa's mother took him to the doctor, but nothing of significance was found. That evening, Lisa brought K.M. home, but Grove was absent from the house overnight and was never around K.M. The next morning, Todd's wife picked up K.M. for an overnight visitation. Lisa and Grove went on a recreational outing and Lisa's daughter was with a relative in Oregon.

At approximately 4 p.m. on July 8, Todd and his wife decided it was necessary to take K.M. to the emergency room, where they expressed concerns about a sore on K.M.'s nose and several bruises on his jaw and one under his armpit and requested that Child Protection Services (CPS) be called. A doctor examined K.M. and called CPS who consulted with the family. K.M. left the hospital with his father and stepmother at approximately 7:10 p.m.

On July 9, Todd returned K.M. to Lisa who proceeded to bathe K.M. She testified that K.M. was continuing to act ill and wanted to be held for a prolonged period, which was unusual. When K.M.'s older sister arrived home, K.M. was excited to see her and briefly acted more lively. He opened a gift from his sister and the two played with a balloon. At dinner K.M. exhibited a normal appetite, but after dinner he acted tired and declined to color in a book his sister had provided to him. Lisa put him to bed an hour early.

The next morning, Monday, July 10, Lisa awoke at approximately 5:15 a.m. and checked on K.M. She found him awake, laying on his back with his eyes open, and noticed there was dry vomit in the bed. Lisa put K.M. in the bathtub and noticed that he was "very, very pale" and, unlike his usual behavior, did not enjoy his bath. K.M. was placed on Lisa and Grove's bed where he watched cartoons and, according to Grove, again attempted to throw up and his lips turned purple. Because she was the only one who could open the building, Lisa left K.M. with Grove and took her daughter with her to work, planning to come home as soon as she could.

After arriving at work, Lisa noticed that Grove had called and she returned his call at approximately 7:54 a.m. Grove told her that K.M. was worse than when she had left, he was worried about K.M., and he wanted Lisa to come home. Lisa spoke to her son and told him she loved him to which he responded "I too." Lisa testified that K.M. sounded "droopy" on the phone.

At around 8:20 a.m., a hysterical Grove called Lisa and demanded that she come home immediately. He told her that K.M. was not breathing right and that he was getting him ready to take him to the doctor. Lisa arrived home approximately ten minutes later. When she entered, K.M. was laying on the floor on a blanket, struggling to breathe. He appeared to be having convulsions and his eyes were rolling back into his head. Lisa called 911 at 8:54 a.m.

After arriving at the home, paramedics immediately transported K.M. to the hospital where Dr. Jay Hunter quickly diagnosed him as having a severe head injury, which he characterized as "shaken baby syndrome" that occurred in the last twenty-four hours. After Dr. Hunter determined that K.M. needed more specialized care than the hospital could provide, he was taken by helicopter to a

2

hospital in Spokane. At approximately 3 p.m., doctors informed Lisa that K.M. was not going to survive. He was declared brain dead on July 11 at 9:20 a.m., the date on which his death certificate indicates was his date of death. Cardiac death occurred on the morning of July 12 when the organ donation procedure was performed.

The night of July 12, Grove and Lisa stayed at Grove's father's house during which time Grove tearfully told Lisa that something had happened to K.M. while he had been watching him on July 10. Lisa loudly asked Grove what had happened, causing Grove's father and stepmother to enter the room. Grove told them that he had placed K.M. on the counter, left him there to go get a brush, and K.M. had fallen off.

Approximately six months later, a grand jury indicted Grove for first degree felony murder, Idaho Code §§ 18-4001, 18-4002, 18-4003(d) . . . .

At trial, both the state and the defense presented the testimony of several medical experts. The emergency room doctor, Dr. Hunter, testified that his opinions regarding K.M.'s condition had changed after reviewing the autopsy report. He first testified that he did not believe that K.M. had "simple" shaken baby syndrome and testified that his injuries were consistent with either being ejected from an automobile or being beaten very severely. Dr. Hunter also testified that based on the autopsy report, it was his opinion that K.M. would have been immediately symptomatic after being beaten--including having a severe headache and confusion--and would have been close to unconsciousness. Thus, Dr. Hunter opined, K.M. could not have been fatally injured prior to the morning of July 10.

Dr. Marco Ross was employed as the county's medical examiner at the time of K.M.'s death and performed the autopsy of K.M.'s body. Dr. Ross testified at trial as the state's forensic pathologist. He stated that, in performing the autopsy, he noted bruising on the body, several hemorrhages in K.M.'s brain and eyes and in other parts of his body, and internal bruising. Dr. Ross indicated that he removed K.M.'s brain, and consistent with his office's procedure, sent it to Dr. Ross Reichard, a neuropathologist at the University of New Mexico. He testified that Dr. Reichard performed an autopsy of the brain and sent a report of his findings and conclusions to Dr. Ross. Dr. Ross summarized Dr. Reichard's report, which indicated that K.M.'s brain showed a bilateral subdural hemorrhage, bilateral subarachnoid hemorrhage, and several other injuries as well as a laceration in the corpus callosum "which is a part of the brain that connects the two separate hemispheres of the brain[.]" Dr. Ross then testified that:

> [T]he laceration itself would sever some nerve bundles that travel between each side of the brain. And actually that injury, in and of itself, per se, may or may not have a lot of recognizable changes in a person who survives such as that.
>
> But what's more significant is the fact that--that a tear did occur is indicative of a degree of force that was impacted upon the head that an individual who sustained a laceration of the corpus callosum as a result of blunt force impact, you know, probably would have been rendered unconscious or nearly unconscious at the time of the impact.

3

Dr. Ross explained that according to Dr. Reichard's report, K.M.'s brain injuries showed a lack of inflammation and therefore would have been inflicted shortly before death. He also testified that applying the force necessary to lacerate the corpus callosum would likely have caused K.M. to become unconscious at the time of impact. He testified that based on his examination, all of the injuries, with the exception of a few bruises on K.M.'s lower back and jaw, were caused at approximately the same time--which was less than three to four days before K.M.'s cardiac death on July 11, and more likely one to two days before. He indicated that K.M.'s abdominal injuries would have immediately caused him debilitating pain and that his brain injuries would have rendered him almost immediately unconscious or nearly so. On this basis, he opined that K.M. could not have suffered such an injury prior to going to bed the night before based on the testimony from Lisa and others about K.M.'s physical activity that night and on Monday morning as those activities would have been impossible had K.M. already suffered the beating which eventually caused his death. Dr. Ross specifically noted that K.M. would not have been able to speak on the phone with his mother.

On cross-examination, Dr. Ross testified that he had not performed any independent testing on K.M.'s brain. He testified that he would have generally been able to identify several of the hemorrhages, but not other injuries including a corpus callosum laceration which can only be identified through microscopic examination. Dr. Ross indicated that while it would be possible to review Dr. Reichard's findings by viewing the "recuts" with a microscope, he had not done so. He further testified that he did not recall if photographs had been taken of the tissues viewed by Dr. Reichard or whether he had reviewed any such photographs.

Based on his observations and the injuries described in Dr. Reichard's written report, Dr. Ross testified that it was his expert opinion that K.M.'s death was caused by homicide, specifically due to blunt impact injuries to his head which caused a subdural hemorrhage and secondary brain swelling. Again relying on Dr. Reichard's report, Dr. Ross concluded that the hemorrhages in K.M.'s brain were "acute," meaning that the injury likely occurred "sometime immediately before death or within a day or two prior to death." Because it was determined that K.M. was brain dead at 9:20 a.m. on July 11, Dr. Ross opined that Grove had been alone with K.M. during the window in which K.M.'s head injuries likely occurred--from around 7 a.m. to approximately 8:45 a.m. on July 10.

The state also called Dr. Deborah Harper, a Spokane pediatrician with special training in child physical and sexual abuse and neglect who had been called to the hospital to examine K.M. before he died. After first describing her own observations of K.M.'s injuries when she saw him, examining his records, and speaking to his mother, Dr. Harper testified that she had relied on the autopsy reports of Dr. Ross and Dr. Reichard (without specifically telling the jury what those reports contained) and the surgery notes from the organ harvest procedure to come to a conclusion about the cause of K.M.'s death and his physical

manifestations of injury prior to his death. Regarding K.M.'s injuries, she opined that

> [K.M.] died as a result of two fatal injuries. The one that actually killed him first was the extremely serious brain injury that caused enormous brain swelling to the point that his brain pressure--the swelling was so great that the blood pumping from his heart could not get into the brain to feed the brain cells.
>
> In addition to that, the pressure on the brain was pushing down through the big hole at the base here where your spinal cord goes, so he had a herniation in midbrain, which is really important for breath, and other things [were] being squished down through that.
>
> In addition, he had really quite awful abdominal injuries. At the time of his organ harvest, the surgeon noted that he had bruising in his colon so the big--that's the large bowel. He had bruising there and bruising in his small intestine as well.
>
> And even more than that, the--the root--that's called the mesentery. But the root that holds your intestines in place, and it's a very strong tissue. It's like--it's like really strong material, like canvas. And it's important because it holds the intestines where they belong so they don't get twisted up, and it--the blood vessels and nerves come through it. That had a rip in it. And that's just enormous force, and that was--we always suspect when children have a bad brain injury, they may have abdominal trauma. I was quite surprised myself at the extent of that major, major abdominal trauma that [K.M.] suffered.

When asked about her opinion as to when the injuries that caused his death occurred, she stated:

> When these injuries occurred, he immediately looked awful. He would have been unconscious or semi-conscious, limp, not--probably not breathing well, perhaps still breathing at that time. But he would have immediately--on the blows that dealt these injuries, would have been obviously critically ill.

She also indicated her opinion that his behavior on the morning of July 10, as testified to by his mother and sister, was not consistent with having already received the injuries that would eventually kill him. She also opined that falling off the counter would not have caused the catastrophic injuries K.M. sustained, nor could such a fall have exacerbated an existing injury and caused it to become fatal because the type of injury that actually killed K.M. was a single injury that caused immediate swelling of the brain. Dr. Harper then addressed whether K.M. could have had a delayed response to the injuries to his brain--for example, a slow bleeding in his brain that would not have produced physical symptoms for a few days after the injury. When asked by the defense attorney whether she was aware that there are studies and reports in various medical journals indicating that there can be a delayed response to subdural hematomas, Dr. Harper answered:

> There can be a delayed response to subdural hematomas. In [K.M.'s] case, he [had] subdural hematomas, which are interesting that

they're there, but that wasn't his main brain injury. His main brain injury was actually to the physical solid part of his brain.

Grove called Dr. Jonathan Arden, a forensic pathologist based in Virginia, to testify as an expert. Dr. Arden testified that he had reviewed, among other things, the autopsy report, including the brain examination report prepared by Dr. Reichard, recuts of the microscopic slides of tissue from K.M.'s body and brain that had been used by Dr. Reichard and Dr. Ross in conducting the autopsy, and autopsy photographs. He testified that based on his review of these materials, he agreed with Dr. Ross that K.M.'s death was the result of homicide and caused by blunt impact injuries to his head--specifically referencing a subdural hemorrhage and brain swelling, but disagreed with Drs. Ross and Harper as to the timing of the injuries, stating that he believed that the significant injuries to K.M.'s head and abdomen had been inflicted at least three days prior to his death--on either July 8 or 9. He testified that his opinion on this matter had come largely from microscopic examination of relevant tissues and his observations as certain body processes which are used to date injuries.

Dr. Arden also testified that he disagreed with Dr. Reichard's conclusion that there was a laceration of the corpus callosum, rather he believed that what Dr. Reichard had perceived as a laceration was merely something that occurred during the processing of K.M.'s brain after his death. He testified that the existence of a laceration would have significant impact on whether a person would be rendered immediately unconscious or not. He testified that it was his opinion that K.M. could have engaged in all of the activities testified to-- including, among other things, playing with his sister when she returned from her trip and sitting in his high chair and eating dinner--having already sustained the head injuries that would lead to his death.

Dr. Arden also opined that K.M. having thrown up in bed, being pale, and dry-heaving on the morning of July 10 are all possible symptoms of the type of head injury and abdominal injuries that Dr. Arden believed that K.M. had sustained and that it was reasonable that having sustained these injuries, K.M. would not have immediately shown symptoms and that his symptoms could have waxed and waned over a period of time. He did admit that if he assumed that the injuries had occurred on Monday morning (which he did not agree with due to his dating of the injuries through viewing the microscopic slides), it would have been consistent with his injuries for K.M. to become immediately unconscious. Dr. Arden further indicated his opinion that many of K.M.'s abdominal injuries were older and therefore there was no reason to conclude that K.M. would have been showing signs of being in excruciating pain from those injuries on July 8 or 9.

The jury found Grove guilty of first degree felony murder.

This Court affirmed Grove's conviction on direct appeal. Relevant to the present appeal, we held that trial counsel's failure to object on confrontation grounds to evidence from Dr. Ross which relied on Dr. Reichard's report did not constitute fundamental error. *Grove*, 151 Idaho at 492-93, 259 P.3d 638-39.

6

Grove filed a petition for post-conviction relief alleging: (1) violation of his constitutional rights; (2) prosecutorial misconduct at trial; (3) a violation of due process because jurors were sleeping during the presentation of evidence; (4) ineffective assistance of counsel for failing to object to the prosecutorial misconduct alleged in the second cause of action; and (5) ineffective assistance of counsel for failing to take thirty-three different actions at trial that Grove concluded should have been taken. The parties filed cross-motions for summary disposition. The district court denied Grove's motion and granted the State's motion in part and denied it in part. The case proceeded to an evidentiary hearing, after which the district court denied the remaining claims. Grove filed a timely appeal from the final judgment denying his petition.

## II.

## ANALYSIS

On appeal, Grove claims: (1) the district court erred in dismissing the Confrontation Clause claim; (2) the district court erred in dismissing the prosecutorial misconduct claim; (3) the district court erred in summarily dismissing certain ineffective assistance of trial counsel claims; (4) the district court erred in denying the claims of ineffective assistance of counsel after an evidentiary hearing with respect to Grove's testimony, Dr. Arden's testimony as an expert witness for the defense, and deficient closing and rebuttal arguments; and (5) the cumulative effect of the totality of the deficient performance was prejudicial. We will first address the issue of raising constitutional violations in an action for post-conviction relief. Second, we will address those claims summarily dismissed by the district court. Finally, we will address those claims denied after the evidentiary hearing.

### A.    Constitutional Claims

In his petition, Grove pled the Confrontation Clause violation claim and claims of prosecutorial misconduct as direct, stand-alone constitutional claims. The district court determined that the claims were not properly brought in post-conviction proceedings. We will address each in turn.

#### 1.    Confrontation Clause

In his petition for post-conviction relief, Grove asserted that his right to confront witnesses was violated in the criminal trial when witnesses called by the State testified about neuropathology tests and examination results which were relied upon and incorporated into the

7

autopsy report for purposes of determining the cause and manner of K.M.'s death. Grove contended that the State's medical witnesses relied on the results of the neuropathology testing but had neither performed nor had personal knowledge of the neuropathology testing or examination. Grove asserted that his right to confront witnesses was, thus, violated when the neuropathologist who did perform the tests, Dr. Reichard, was not a witness at the trial.

The district court ruled that because there was no objection at trial to the autopsy report or testimony referencing Dr. Reichard's findings, there could not be a Confrontation Clause violation. The district court also referenced this Court's decision on direct appeal in stating that trial counsel's decision not to object to testimony referencing Dr. Reichard's findings may have been a tactical decision. The district court indicated that this issue would be addressed in the context of the ineffective assistance of counsel claim. Grove argues that a constitutional claim alleging a violation of the Confrontation Clause can be raised in a post-conviction proceeding.

Grove points to I.C. § 19-4901 in support of his contention that a contemporaneous objection is not required to proceed under the Uniform Post-Conviction Procedure Act. Further, Grove argues that barring him from raising the Confrontation Clause claim in post-conviction proceedings eliminates any forum to raise his claim. The State argues that Grove forfeited his Confrontation Clause claim by failing to object at trial. The State contends that it would invite "sandbagging" if defense counsel could choose not to object at trial because the objection could always be raised for the first time in post-conviction, bypassing the fundamental error rule applicable on direct appeal. The State also points out that the Confrontation Clause issue can also be raised in the context of ineffective assistance of counsel.

The scope of post-conviction relief is limited. *Knutsen v. State*, 144 Idaho 433, 438, 163 P.3d 222, 227 (Ct. App. 2007). Idaho Code Section 19-4901(a) states: "Any person who has been convicted of, or sentenced for, a crime, and who claims . . . [t]hat the conviction or the sentence was in violation of the constitution of the United States . . . may institute . . . a proceeding under this act to secure relief." However, a petition for post-conviction relief is not a substitute for an appeal. I.C. § 19-4901(b). A claim or issue that was or could have been raised on appeal may not be considered in post-conviction proceedings. *Id.*; *Mendiola v. State*, 150 Idaho 345, 348-49, 247 P.3d 210, 213-14 (Ct. App. 2010).

It is undisputed that trial counsel did not object to the admission of Dr. Ross's autopsy report, which incorporated Dr. Reichard's findings from the brain autopsy, nor did defense

counsel object when medical experts testified regarding Dr. Reichard's findings. Grove raised the Confrontation Clause issue for the first time on direct appeal. This Court reviewed the claim under the fundamental error doctrine outlined in *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010).[1] We determined that although the State did not dispute that an unwaived constitutional right was implicated, Grove was not able to meet the clear or obvious error prong of the analysis. This Court stated that "the record simply does not eliminate the possibility that the failure to object was strategic." *Grove*, 151 Idaho at 492, 259 P.3d at 638.[2] The deposition of trial counsel, taken after we issued our decision on direct appeal, reinforced this proposition. Trial counsel testified that the autopsy report contained bad facts for his theory of the case and he thought it would have been better to exclude it. However, he felt that the expert testifying for the defense, Dr. Arden, would "poke enough holes . . . to make . . . reliance on that report misplaced." Counsel's choice of witnesses, manner of cross-examination, and lack of objections

---

[1]　　In *Perry*, the Supreme Court summarized the analysis which applies in cases of unobjected-to error:

> (1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010) (footnote omitted).

[2]　　More particularly, we stated:

> In assessing whether to object in this instance, defense counsel would have not only had to weigh the best case scenario that the testimony would be excluded, but also the more likely possibility that a timely objection would have prompted the state to subpoena Dr. Reichard to "defend" his findings and conclusions. Had that occurred, anything short of the unlikely circumstance of Dr. Reichard admitting that he erred in his methods and/or findings would have resulted in diminishing the ability for Grove to argue that Dr. Reichard's findings were "faulty" and thus question the reliability of the testimony of each doctor that relied on the brain autopsy to come to the conclusion that the injuries must have been inflicted during the time that Grove was alone with K.M.--as he did at trial both through cross-examination of Dr. Ross and through the testimony of Dr. Arden. To refrain from objecting and instead attack Dr. Reichard's report *in absentia* is certainly a viable trial strategy, and thus we cannot say that it would not be reasonable for either the court or defense counsel to allow the testimony.

*State v. Grove*, 151 Idaho 483, 492, 259 P.3d 629, 638 (Ct. App. 2011).

to testimony are considered tactical or strategic decisions. *Giles v. State*, 125 Idaho 921, 924, 877 P.2d 365, 368 (1994). Thus, Grove was provided the avenue of asserting the Confrontation Clause issue as fundamental error. However, he failed to establish the *Perry* requirements.

In *Mintun v. State*, 144 Idaho 656, 661, 168 P.3d 40, 45 (Ct. App. 2007), the petitioner challenged, through post-conviction proceedings, that his appellate counsel was ineffective for not raising certain issues on appeal. *Id.* at 662, 168 P.3d at 46. In affirming the district court's denial of that claim, we held that the proper way for a defendant to challenge an unpreserved trial error is to assert ineffective assistance of trial counsel in a post-conviction proceeding. *Id*. The Court of Appeals has not held, "even tangentially, that an unpreserved trial error itself can be raised in a post-conviction proceeding." *Bias v. State*, 159 Idaho 696, 703, 365 P.3d 1050, 1057 (Ct. App. 2015) (upholding dismissal of claims of prosecutorial misconduct asserted for the first time in post-conviction).

The alleged constitutional violation raised by Grove in post-conviction points to counsel's actions at trial and the repercussions of those actions, the same actions that will be analyzed under the ineffective assistance of counsel claim in this case. It was trial counsel's failings, not just in failing to object at trial but also in failing to make a proper record as to Dr. Reichard's report, which resulted in insufficient proof as to the second prong of the fundamental error analysis. It is incongruous for this Court to consider, in the same post-conviction proceeding, a constitutional confrontation violation claim which places the prejudice burden on the State on one hand, and on the other hand an ineffective assistance of counsel claim which places the prejudice burden on the petitioner, both grounded upon the alleged failing of counsel. Grove's potential remedy is not in raising a claim of constitutional violation in post-conviction proceedings; he already utilized that opportunity on direct appeal. Rather, Grove's potential remedy is in demonstrating that the forfeitures of claims of errors in the trial court were the result of ineffective assistance of counsel, which will be addressed later in this opinion. *Bias*, 159 Idaho at 703, 365 P.3d at 1057 (citing *Mintun*, 144 Idaho at 662, 168 P.3d at 46). Grove has failed to show error in the summary dismissal of the constitutional violation claim.

### 2. Prosecutorial misconduct

Grove argues that the district court erred in determining that his claim of prosecutorial misconduct was waived because it was not raised on appeal. As mentioned above, a claim or issue that was or could have been raised on appeal may not be considered in post-conviction

proceedings. I.C. § 19-4901(b); *Mendiola*, 150 Idaho at 348-49, 247 P.3d at 213-14. To be granted post-conviction relief on an issue that could have been raised on direct appeal, but was not, a petitioner must show, on the basis of a substantial factual showing by affidavit, deposition, or otherwise, that "the asserted basis for relief raises a substantial doubt about the reliability of the finding of guilt and could not, in the exercise of due diligence, have been presented earlier." I.C. § 19-4901(b); *Gonzales v. State*, 120 Idaho 759, 763, 819 P.2d 1159, 1163 (Ct. App. 1991).

Grove challenges several instances of the prosecutor's trial conduct that he contends were a gross violation of a prosecutor's duty to ensure fairness in every stage of the trial. Grove asserts that the prosecutor: (1) projected family photos and autopsy photos of K.M. on a screen when jurors were entering the courtroom; (2) elicited testimony from K.M.'s sister, a young child, that was outside the scope of what the court had agreed to; (3) admitted photographs of the crime scene which showed sympathy cards for K.M.'s mother in the background and were inadmissible; (4) raised issues that were irrelevant and unfairly prejudicial when cross-examining Grove; (5) presented inadmissible impeachment evidence when cross-examining Dr. Arden and suggested Dr. Arden was on mission to support the defense; and (6) made various statements during closing argument that were prejudicial.

There were no objections at trial to the events underlying these assertions. As noted by the district court, even without trial counsel's contemporaneous objection to the prosecutor's conduct, Grove's appellate counsel could have raised the issue on appeal. In his petition, Grove did not present the district court with any evidence that the issue could not, in the exercise of due diligence, have been presented earlier. Rather, citing *Perry*, 150 Idaho at 226, 245 P.3d at 978, he conclusively states that the unobjected-to prosecutorial misconduct could not have been raised on appeal. However, the Court provided in *Perry*:

> Where prosecutorial misconduct was not objected to at trial, Idaho appellate courts may only order a reversal when the defendant demonstrates that the violation in question qualifies as fundamental error . . . . If the defendant fails to meet his burden then an appellate court may not reverse under the fundamental error doctrine.

*Id*. at 227, 245 P.3d at 979.

The Court further noted that "the defendant may still file a petition for post-conviction relief proceedings in order to ascertain whether defense counsel's failure to object to the alleged error constituted ineffective assistance of counsel." *Id*. n.7.

11

Because Grove did not present evidence as to why the issue could not have been presented on direct appeal, he has waived the issue. Again, Grove still has the opportunity to assert ineffective assistance of counsel. The district court properly summarily dismissed the stand-alone prosecutorial misconduct claim.

**B.      Ineffective Assistance of Counsel Claims Summarily Dismissed**

In his petition, Grove alleged several instances of ineffective assistance of counsel. The district court addressed some of these allegations after holding an evidentiary hearing. The remaining allegations were summarily dismissed prior to the hearing. A petition for post-conviction relief initiates a proceeding that is civil in nature. I.C. § 19-4907; *Rhoades v. State*, 148 Idaho 247, 249, 220 P.3d 1066, 1068 (2009); *State v. Bearshield*, 104 Idaho 676, 678, 662 P.2d 548, 550 (1983); *Murray v. State*, 121 Idaho 918, 921, 828 P.2d 1323, 1326 (Ct. App. 1992). Like a plaintiff in a civil action, the petitioner must prove by a preponderance of evidence the allegations upon which the request for post-conviction relief is based. *Goodwin v. State*, 138 Idaho 269, 271, 61 P.3d 626, 628 (Ct. App. 2002). A petition for post-conviction relief differs from a complaint in an ordinary civil action. *Dunlap v. State*, 141 Idaho 50, 56, 106 P.3d 376, 382 (2004). A petition must contain much more than a short and plain statement of the claim that would suffice for a complaint under Idaho Rule of Civil Procedure 8(a)(1). Rather, a petition for post-conviction relief must be verified with respect to facts within the personal knowledge of the petitioner, and affidavits, records, or other evidence supporting its allegations must be attached or the petition must state why such supporting evidence is not included with the petition. I.C. § 19-4903. In other words, the petition must present or be accompanied by admissible evidence supporting its allegations or the petition will be subject to dismissal. *Wolf v. State*, 152 Idaho 64, 67, 266 P.3d 1169, 1172 (Ct. App. 2011).

Idaho Code Section 19-4906 authorizes summary dismissal of a petition for post-conviction relief, either pursuant to a motion by a party or upon the court's own initiative, if it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of fact, together with any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. When considering summary dismissal, the district court must construe disputed facts in the petitioner's favor, but the court is not required to accept either the petitioner's mere conclusory allegations, unsupported by admissible evidence, or the petitioner's conclusions of law. *Roman v. State*, 125

Idaho 644, 647, 873 P.2d 898, 901 (Ct. App. 1994); *Baruth v. Gardner*, 110 Idaho 156, 159, 715 P.2d 369, 372 (Ct. App. 1986). Moreover, the district court, as the trier of fact, is not constrained to draw inferences in favor of the party opposing the motion for summary disposition; rather, the district court is free to arrive at the most probable inferences to be drawn from uncontroverted evidence. *Hayes v. State*, 146 Idaho 353, 355, 195 P.3d 712, 714 (Ct. App. 2008). Such inferences will not be disturbed on appeal if the uncontroverted evidence is sufficient to justify them. *Id.*

Claims may be summarily dismissed if the petitioner's allegations are clearly disproven by the record of the criminal proceedings, if the petitioner has not presented evidence making a prima facie case as to each essential element of the claims, or if the petitioner's allegations do not justify relief as a matter of law. *Kelly v. State*, 149 Idaho 517, 521, 236 P.3d 1277, 1281 (2010); *DeRushé v. State*, 146 Idaho 599, 603, 200 P.3d 1148, 1152 (2009). Thus, summary dismissal of a claim for post-conviction relief is appropriate when the court can conclude, as a matter of law, that the petitioner is not entitled to relief even with all disputed facts construed in the petitioner's favor. For this reason, summary dismissal of a post-conviction petition may be appropriate even when the state does not controvert the petitioner's evidence. *See Roman*, 125 Idaho at 647, 873 P.2d at 901.

Conversely, if the petition, affidavits, and other evidence supporting the petition allege facts that, if true, would entitle the petitioner to relief, the post-conviction claim may not be summarily dismissed. *Charboneau v. State*, 140 Idaho 789, 792, 102 P.3d 1108, 1111 (2004); *Sheahan v. State*, 146 Idaho 101, 104, 190 P.3d 920, 923 (Ct. App. 2008). If a genuine issue of material fact is presented, an evidentiary hearing must be conducted to resolve the factual issues. *Goodwin*, 138 Idaho at 272, 61 P.3d at 629.

On appeal from an order of summary dismissal, we apply the same standards utilized by the trial courts and examine whether the petitioner's admissible evidence asserts facts which, if true, would entitle the petitioner to relief. *Ridgley v. State*, 148 Idaho 671, 675, 227 P.3d 925, 929 (2010); *Sheahan*, 146 Idaho at 104, 190 P.3d at 923. Over questions of law, we exercise free review. *Rhoades*, 148 Idaho at 250, 220 P.3d at 1069; *Downing v. State*, 136 Idaho 367, 370, 33 P.3d 841, 844 (Ct. App. 2001).

Grove contends each of the following ineffective assistance of counsel claims were erroneously dismissed: (1) deficiency in not asserting Grove's state and federal constitutional

rights to confrontation and in failing to make evidentiary objections; (2) deficiency in not objecting to Lisa's testimony about the autopsy report; (3) deficiency in not objecting to the paramedic's testimony that Grove was too calm when he arrived; (4) deficiency in not cross-examining Dr. Chin's testimony that he could not have missed the injuries described in the autopsy; (5) deficiency in not objecting to Dr. Chin's testimony that "this autopsy report is the most brutal case" he had ever seen; (6) deficiency in not objecting to Dr. Hunter's testimony that subarachnoid hemorrhage has immediate symptoms; (7) deficiency in not objecting to Dr. Hunter's testimony that K.M. was either "ejected from an automobile" or "was beaten very severely"; (8) deficiency in not objecting to Dr. Hunter's testimony that a short fall "is rarely, rarely likely to produce any kind of significant head injury or bleeding" and then failing to impeach; (9) deficiency in not objecting to Dr. Ross's testimony that he was told about hemorrhages in the psoas and retroperitoneal by the transplant surgeon; (10) deficiency in not objecting to the foundation for Dr. Ross's testimony regarding the head and alleged brain injuries because he never viewed any of the slides or recuts himself; (11) deficiency in not objecting to Dr. Ross's testimony that Dr. Reichard's observation of a tear in the corpus callosum showed "a very significant force" applied, comparable to "a very high fall" of "a couple of stories or so," or "a motor vehicle accident, or inflicted blunt force trauma"; (12) deficiency in failing to object or move to strike when Dr. Harper testified that Dr. Ross "is a super clinician"; (13) deficiency in failing to object to the admission of photographs which included approximately thirty sympathy cards; and (14) deficiency in failing to point out the differences between Dr. Reichard's report and the State witnesses' conclusions drawn from it.

A claim of ineffective assistance of counsel may properly be brought under the Uniform Post-Conviction Procedure Act. *Barcella v. State*, 148 Idaho 469, 477, 224 P.3d 536, 544 (Ct. App. 2009). To prevail on an ineffective assistance of counsel claim, the petitioner must show that the attorney's performance was deficient and that the petitioner was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Self v. State*, 145 Idaho 578, 580, 181 P.3d 504, 506 (Ct. App. 2007). To establish a deficiency, the petitioner has the burden of showing that the attorney's representation fell below an objective standard of reasonableness. *Aragon v. State*, 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988); *Knutsen*, 144 Idaho at 442, 163 P.3d at 231. To establish prejudice, the petitioner must show a reasonable probability that, but for the attorney's deficient performance, the outcome of the trial would have been different.

14

*Aragon*, 114 Idaho at 761, 760 P.2d at 1177; *Knutsen*, 144 Idaho at 442, 163 P.3d at 231. This Court has long adhered to the proposition that tactical or strategic decisions of trial counsel will not be second-guessed on appeal unless those decisions are based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. *Gonzales v. State*, 151 Idaho 168, 172, 254 P.3d 69, 73 (Ct. App. 2011).

### 1. Constitutional violation

Grove argues that the district court erroneously dismissed his ineffective assistance of counsel claim as to his rights under the Confrontation Clause. After an extensive examination of Confrontation Clause jurisprudence, the district court found that the autopsy report was not testimonial and any objection to the testimony referring to the report would have been overruled.[3] The district court also determined that trial counsel's lack of objection may have been tactical, noting this Court's opinion in the direct appeal. Further, that because there was no violation of the Confrontation Clause, trial counsel could not be deficient for failing to object to testimony referencing Dr. Reichard's findings. Therefore, the district court held that it was not necessary to address the ineffective assistance of counsel claims as they related to Dr. Reichard's findings and summarily dismissed the claim.

Grove argues that the evidence referencing Dr. Reichard's findings was testimonial and a confrontation objection would have been sustained. Grove asserts that even if trial counsel's failure to object was due to a strategy, it was unreasonable. Grove avers that the failure to object was prejudicial as the exclusion of evidence as to the timing and nature of the injuries would have furthered the defense's case. Finally, Grove argues that the district court did not rule on his claim that trial counsel should have objected because the evidence relating to Dr. Reichard's findings was inadmissible under Idaho Rule of Evidence 703. The State argues that based on the law as it stood at the time of trial, a confrontation objection would not have been meritorious. Further, even if the objection had been meritorious, this alone does not support a prima facie claim of ineffective assistance of counsel. Finally, there is no evidence that trial counsel's lack of objection was based on any objective shortcoming, but rather was a tactical decision based on trial counsel's belief that the defense's expert witness could reveal weaknesses in the State's case.

---

[3] Because the issue of a direct constitutional violation is not properly before us, we need not determine whether the autopsy report was testimonial.

We agree that trial counsel's decision not to object to the evidence referencing Dr. Reichard's findings was a strategic one. As mentioned above, counsel's choice of witnesses, manner of cross-examination, and lack of objections to testimony are considered tactical or strategic decisions. *Giles*, 125 Idaho at 924, 877 P.2d at 368. This Court has long adhered to the proposition that tactical or strategic decisions of trial counsel will not be second-guessed on appeal unless those decisions are based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. *Howard v. State*, 126 Idaho 231, 233, 880 P.2d 261, 263 (Ct. App. 1994); *Davis v. State*, 116 Idaho 401, 406, 775 P.2d 1243, 1248 (Ct. App. 1989). Dr. Reichard's findings are the crux of the central issues in this case--when the injuries that ultimately caused K.M.'s death occurred and whether it was likely that K.M. would have lost consciousness and/or shown severe symptoms immediately after the injuries were inflicted. To that end, trial counsel was reasonably leery of Dr. Reichard being called to testify and being a strong witness for the State. Further, Grove does not identify what trial counsel could have achieved if Dr. Reichard had been required to testify as opposed to using the defense's own expert, Dr. Arden, to "poke holes" in Dr. Reichard's findings. Grove has not demonstrated that the cross-examination of Dr. Reichard would have been a more effective strategy when, in fact, it is possible that Dr. Reichard's testimony may have undermined Dr. Arden's testimony.

Grove has failed to demonstrate that trial counsel's decision was the product of inadequate preparation, ignorance of the law, or other objective shortcomings. Accordingly, we will not second-guess this decision on appeal. As a result, the district court did not err in summarily dismissing Grove's claim for ineffective assistance of counsel in not asserting Grove's state and federal constitutional rights to confrontation and in failing to make related evidentiary objections.

### 2. Lisa's testimony

Grove argues that the district court erroneously dismissed his ineffective assistance of counsel claim as to trial counsel's failure to make a hearsay objection when Lisa testified that she was told that K.M. "had blood in his brain" and "there was nothing they could do." The district court dismissed this claim concluding that a hearsay objection would not have been sustained because Lisa "was not testifying as to the truth of the matter asserted, but rather explaining her

16

understanding of the events of the day." Further, the district court determined that there was no evidence of prejudice.

Grove avers that because the State argued for dismissal on the basis of strategy, the district court failed to give sufficient notice before dismissing on the ground that the statement was not hearsay.[4] However, Grove does not challenge the district court's determination that there was no evidence of prejudice. Therefore, we affirm the district court's conclusion. *State v. Goodwin*, 131 Idaho 364, 366-67, 956 P.2d 1311, 1313-14 (Ct. App. 1998) (appellate court will not reverse where trial court's ruling is based on an unchallenged "independent, alterative basis").

### 3. Paramedic's testimony

Grove argues that the district court erroneously dismissed his ineffective assistance of counsel claim as to trial counsel's failure to object to the paramedic's testimony that Grove appeared "too calm." The paramedic talked with Grove to obtain K.M.'s medical history as other paramedics carried K.M. to the ambulance. Grove avers that the paramedic's opinion was not relevant nor did it fall within the scope of admissible opinion testimony by a lay witness because it involved specialized knowledge. The district court dismissed the claim finding that the testimony was admissible as a lay opinion, that Grove had not raised an issue of material fact that counsel was deficient for failing to object, and that Grove also failed to establish a material issue of fact as to prejudice.[5]

The paramedic testified, in part:

Q. Describe, if you can, his demeanor while you were talking to him.
A. It was calm, very calm. Too calm, in my opinion.
Q. By saying "too calm," you didn't know him before, did you?
A. Huh-uh.
Q. And you don't know how he reacts to--
A. Not at all.

---

[4]     Where the State has filed a motion for summary disposition, but the court dismisses the petition on grounds different from those asserted in the State's motion, it does so on its own initiative and the court must provide twenty days' notice. *Saykhamchone v. State*, 127 Idaho 319, 322, 900 P.2d 795, 798 (1995).

[5]     Grove contends that the district court dismissed on grounds not raised by the State. We disagree. When a district court summarily dismisses a post-conviction claim relying in part on the same grounds presented by the State in its motion for summary dismissal, the notice requirement has been met. *Kelly*, 149 Idaho at 523, 236 P.3d at 1283.

Q. But when you say "too calm," is that based on your experience with other people in similar situations?

A. Yes. Parents are usually excitable when their child is very sick.

The Idaho Rules of Evidence provide that a lay witness may give testimony containing an opinion or inference if the testimony is "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge . . . ." I.R.E. 701. The Idaho Supreme Court has held that the "perception of the witness" requirement in Rule 701(a) requires opinions and inferences to be based upon "the witness's personal knowledge of events or facts . . . ." *State v. Raudebaugh*, 124 Idaho 758, 767, 864 P.2d 596, 605 (1993). This requires "the same personal knowledge of events as required by I.R.E. 602," which provides that "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." *Id.* (quoting I.R.E. 602). Therefore, "a lay witness may give an opinion or inference if doing so helps to explain the witness's testimony or to determine a disputed fact and the opinion or inference is based upon the witness's personal knowledge as demonstrated by evidence." *State v. Joy*, 155 Idaho 1, 16, 304 P.3d 276, 291 (2013).

The paramedic's testimony was rationally based on his own perceptions, it was helpful to the jury, and the basis for the opinion did not rely on scientific, technical, or other specialized knowledge. The paramedic's testimony established that he had personal knowledge of the matter on which he was rendering an opinion. He testified that he had been a paramedic for fourteen years. The witness was testifying based on Grove's demeanor during their conversation. With respect to Grove's assertion that the paramedic's opinion was based on the false assumption that Grove was K.M.'s father, the paramedic also testified that Grove had told him that K.M. had been ill when he returned from visiting his father. Regardless, Grove himself testified that he thought of K.M. as his son. We conclude that the district court did not err in summarily dismissing Grove's ineffective assistance of counsel claim pertaining to the paramedic's testimony.

### 4. Dr. Harper's testimony

Grove argues that the district court erroneously dismissed his ineffective assistance of counsel claim as to trial counsel's failure to object or move to strike when Dr. Harper testified

that Dr. Ross "is a super clinician." Grove further argues that trial counsel failed to object to irrelevant and unfairly prejudicial testimony regarding the force needed to inflict K.M.'s injuries.

During trial Dr. Harper was asked, "Are you familiar with Dr. Marco Ross?" She answered: "I am. Dr. Ross, I'm sorry to say, is no longer our--in our Medical Examiner's Office, because he is a super clinician. But he had another opportunity and has moved on. But yes, I am familiar with Dr. Ross." She also testified that the kind of force necessary to inflict injuries similar to those in K.M.'s abdomen was comparable to being dragged by a horse, being stepped on by a horse, or being an unrestrained passenger in a car accident, and that she likely lacked the upper-body strength to inflict such injuries absent kicking, stomping, or using a bat.

Grove has failed to demonstrate deficient performance or prejudice. There is no evidence in the record of any objective failing of counsel, such as inadequate preparation or ignorance of the law. Moreover, there is no evidence to rebut the presumption of a proper tactical choice in declining to object to Dr. Harper's characterization of Dr. Ross. Likewise, there is no evidence that additional foundation for the testimony regarding force could not have been laid as to her testimony regarding force and, therefore, no evidence either that the lack of objection was not a proper tactic or that Grove was prejudiced. We conclude that the district court did not err in summarily dismissing Grove's ineffective assistance of counsel claim pertaining to Dr. Harper's testimony.

### 5.     Photographs of sympathy cards

Grove argues that the district court erroneously dismissed his ineffective assistance of counsel claim as to trial counsel's failure to object to the admission of photographs taken at K.M.'s home which showed in the background approximately thirty sympathy cards sent to Lisa after K.M.'s death. The district court determined that Grove failed to "establish how sympathy cards sent to [Lisa] were inflammatory or unduly prejudicial" and therefore failed to establish either element of a *Strickland* claim.

Evidence may be excluded if its potential for "unfair prejudice" substantially outweighs its probative value. I.R.E. 403. "Unfair prejudice" is the tendency to suggest a decision on an improper basis. *State v. Ruiz*, 150 Idaho 469, 471, 248 P.3d 720, 722 (2010). Grove has not articulated how evidence of expressions of sympathy for loss of a child unfairly prejudiced him. Further, a review of the testimony establishes that sympathy cards were never mentioned. Expressions of sympathy for the loss of a child would have been made to K.M.'s mother

19

regardless of the circumstances surrounding his death. There is nothing prejudicial in the jury being aware that friends and family expressed sympathy for K.M.'s death. "Where the alleged deficiency is counsel's failure to file a motion, a conclusion that the motion, if pursued, would not have been granted by the trial court, is generally determinative of both prongs of the [*Strickland* ] test." *State v. Payne*, 146 Idaho 548, 562, 199 P.3d 123, 137 (2008) (quoting *Sanchez v. State*, 127 Idaho 709, 713, 905 P.2d 642, 646 (Ct. App. 1995)). Grove has failed to show either deficient performance or prejudice. We conclude that the district court did not err in summarily dismissing Grove's ineffective assistance of counsel claim pertaining to the photographs.

### 6. Remaining ineffective assistance of counsel claims summarily dismissed

Grove argues that the district court erroneously dismissed the following ineffective assistance of counsel claims, asserting that the court did not expressly dismiss or address the claims: deficiencies in not properly cross-examining Dr. Chin's testimony; not objecting to Dr. Chin's characterization of the autopsy report; not objecting Dr. Hunter's testimony regarding subarachnoid hemorrhage; not objecting to Dr. Hunter's testimony regarding the cause of K.M.'s injuries; not objecting to Dr. Hunter's testimony as to injuries resulting from a fall and then failing to impeach; not objecting to Dr. Ross's testimony pertaining to hemorrhages; not objecting to the foundation for Dr. Ross's testimony regarding the head and brain injuries; not objecting to Dr. Ross's testimony regarding the tear in the corpus callosum; and failing to point out differences between Dr. Reichard's report and the conclusions drawn from it by the State's witnesses.

Grove relied upon *Dawson v. Cheyovich Family Trust*, 149 Idaho 375, 234 P.3d 699 (2010). In that case, the district court dismissed the plaintiff's claims for failure to prosecute and granted summary judgment on the defendant's counter-claims. *Id*. at 378, 234 P.3d at 702. The plaintiff moved both for reconsideration and to set aside the judgment under I.R.C.P. 60(b)(6). *Dawson*, 149 Idaho at 378-79, 234 P.3d at 702-03. The district court denied the reconsideration but did not issue a ruling on the 60(b)(6) motion. *Id*. at 379, 234 P.3d at 703. The Idaho Supreme Court held that the district court "erred by failing to issue a ruling on Dawson's Rule 60(b)(6) motion." *Id*. at 380, 234 P.3d at 704. In the present case, the district court did not fail to rule on the State's motion for summary disposition. Rather, the district court held as follows:

20

Based upon the foregoing analysis, there are issues of material fact with regard to whether the Petitioner received ineffective assistance of counsel during the trial in this case. Thus, an evidentiary hearing will be held on these issues, limited to those four claims as set forth above. The State's motion for summary disposition is denied with respect to these limited issues. However, the State's motion is granted as to the remaining issues, consistent with the foregoing analysis.

The record establishes that the district court did rule on the State's motion, granting it as to all but four claims. That the district court did not set forth its analysis as to some of those claims was not error. "Summary disposition of a post-conviction relief application under I.C. § 19-4906(c) is the procedural equivalent of summary judgment under I.R.C.P. 56." *Roman*, 125 Idaho at 647, 873 P.2d at 901. "[F]indings of fact are not necessary to support decisions of summary judgment motions under I.R.C.P. 56, or to support a decision relating to any other motion, except with respect to motions for involuntary dismissal under I.R.C.P. 41(b)." *Bank of Idaho v. Nesseth*, 104 Idaho 842, 846, 664 P.2d 270, 274 (1983) (citing I.R.C.P. 52(a)). *See also Gibson v. Ada Cty.*, 142 Idaho 746, 759, 133 P.3d 1211, 1224 (2006) ("findings of fact are unnecessary" in summary judgment motions); *Keesee v. Fetzek*, 111 Idaho 360, 361, 723 P.2d 904, 905 (Ct. App. 1986). Grove has failed to show that the district court erred in summarily dismissing these claims.

## C.      Ineffective Assistance of Counsel Claims Denied After Evidentiary Hearing

Grove asserts trial counsel's performance was ineffective with respect to: (1) direct and cross-examination of Grove at trial; (2) direct and cross-examination of Dr. Arden; and (3) closing argument. Following an evidentiary hearing, the district court issued a written order denying Grove's claim of ineffective assistance of counsel as it pertained to each of these claims.

In order to prevail in a post-conviction proceeding, the petitioner must prove the allegations by a preponderance of the evidence. I.C. § 19-4907; *Stuart v. State*, 118 Idaho 865, 869, 801 P.2d 1216, 1220 (1990); *Baxter v. State*, 149 Idaho 859, 861, 243 P.3d 675, 677 (Ct. App. 2010). When reviewing a decision denying post-conviction relief after an evidentiary hearing, an appellate court will not disturb the lower court's factual findings unless they are clearly erroneous. Idaho Rule of Civil Procedure 52(a); *Dunlap*, 141 Idaho at 56, 106 P.3d at 382; *Russell v. State*, 118 Idaho 65, 67, 794 P.2d 654, 656 (Ct. App. 1990). The credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence are all matters solely within the province of the district court. *Dunlap*, 141 Idaho at 56,

21

106 P.3d at 382; *Larkin v. State*, 115 Idaho 72, 73, 764 P.2d 439, 440 (Ct. App. 1988). We exercise free review of the district court's application of the relevant law to the facts. *Baxter*, 149 Idaho at 862, 243 P.3d at 678.

### 1. Grove's testimony

Grove asserts trial counsel's performance was ineffective during the direct and cross-examination of Grove at trial. Specifically, Grove claims counsel was deficient because he introduced evidence regarding Grove's relationship with his own son and then failed to object when the prosecuting attorney asked whether Grove was behind on child support payments. Further, Grove asserts trial counsel was deficient for failing to object when the prosecuting attorney questioned Grove regarding an Ativan prescription.

### a. Grove's son

Grove alleges deficiency because trial counsel introduced the following testimony about his son:

> It was a complicated situation with Alex. He's ten years old. He's a great boy. It started off rough with the very first. Me and his mother, she basically was gone. When she was pregnant with [K.M.] (sic), she started seeing some other guy. And come to find out, she moved in with him. And, you know, it was a real rocky relationship the whole way through.
>
> And at the latter--the latter time when I was seeing him, there was a pull with him. I could tell that they were telling him things, and he would ask me questions that I didn't think--and it was a hard situation. And at the time, it was my decision that I didn't want to stress him out with it, so I felt it would be best if I removed myself from the situation until he was old enough to be able to--I could talk with him about what was going on. And he wouldn't--he wouldn't have these feelings, because I could tell he was being torn, and I didn't want to see him go through that. And I thought the best would be for what I did, and that was the choice that I made.

Thereafter, the prosecuting attorney followed the questioning to reveal that Grove did not maintain a relationship with his son nor did he make child support payments. At the evidentiary hearing, trial counsel stated that he could not recall why he elicited this testimony and he admitted that it was unfavorable to Grove. In fact, trial counsel had filed a motion in limine to prohibit any mention of the relationship and/or child support. But, the record does not show a ruling on this motion. Trial counsel further stated that he thought about objecting to the prosecutor's question pertaining to child support, but chose not to in order to not draw the jury's attention to the issue more than it already had been. An expert witness for Grove, attorney Andrew Parnes, testified that there was no valid strategic purpose for Grove's testimony.

22

Further, that the questioning regarding child support was objectionable because it was not relevant, was the subject of a motion in limine, and was inadmissible under I.R.E. 403.

This Court has recognized that "counsel has broad discretion when formulating strategy and tactics prior to and during trial." *State v. Roles*, 122 Idaho 138, 148, 832 P.2d 311, 321 (Ct. App. 1992). *See also Ramsey v. State*, 159 Idaho 887, 367 P.3d 711 (Ct. App. 2015). Thus, we will not second-guess trial counsel's decisions absent evidence of "inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective evaluation." *Davis*, 116 Idaho at 406, 775 P.2d at 1248. To satisfy the requirements of *Strickland*, Grove must show that trial counsel's performance was deficient and that prejudice resulted from the deficiency. It is unreasonable to assume that the jury would make the leap from evidence of a father who has had difficulties with involvement in his child's life to one capable of committing a fatal battery against a toddler. In other words, the evidence is so tangential to the issue of when and how the injuries were inflicted that its admission does not undermine confidence in the outcome. The district court did not err in finding that trial counsel's representation did not fall below reasonable professional standards with respect to Grove's testimony or that the record lacks evidence that prejudice resulted from any such deficiency.

### b. Prosecuting attorney's statement

Grove alleges deficiency in failing to move to strike the prosecutor's comments after his objection to a statement made by the prosecuting attorney was sustained. The prosecutor characterized Grove's testimony as "the story you've told," which is "the story you need the jury to believe" and then suggested that "some things . . . just don't really seem to make sense." Trial counsel's objection was sustained, but he did not ask that the comments be stricken or that the jury be instructed to disregard the comments. At the evidentiary hearing, trial counsel did not recall why he did not ask to strike. Mr. Parnes testified that counsel should have asked to strike and that the comment was so egregious that a mistrial motion should have been considered.

The district court held that Grove had failed to establish that trial counsel's failure to ask for a motion to strike rises to the level of deficient performance. Further, there is nothing in the record to establish that, but for the failure to request the district court strike the testimony, the outcome of the case would have been different. We agree. Therefore, the district court did not err in finding that Grove failed to meet his burden on this claim.

23

### c.      Grove's medication

Grove alleges deficiency in failing to object to the prosecutor asking Grove during cross-examination about his emotional state during trial. At trial, Grove was scheduled to testify on a Friday; however, the case was delayed until Monday because Grove was unable to testify or aid in his defense due to his emotional state on that day. The jury was informed that an unforeseen medical situation had arisen which affected the court's ability to proceed that day. During cross-examination of Grove, the prosecuting attorney asked if Grove was currently taking any medications, when the medication was prescribed, and whether it was prescribed due to Grove's emotional state on Friday. In his closing argument, Grove's trial counsel argued that the evidence of a breakdown on Friday was simply an *ad hominem* attack that had nothing to do with the case. The prosecutor then argued in rebuttal:

> So, [defense counsel] talked about, well, why bring up the emotional breakdown of the defendant? Trying to attack the defendant. No, there's a reason for it. The reason for it is the State believes that he had an emotional breakdown, an instantaneous fit of anger, that morning that resulted in these injuries . . . .

At the evidentiary hearing, trial counsel testified that he did not object because he was not sure the testimony was objectionable. Mr. Parnes testified that in his opinion defense counsel should have objected to the testimony as irrelevant and highly prejudicial.

On appeal, Grove cites to *United States v. Wolf*, 787 F.2d 1094, 1099 (7th Cir. 1986) to support his contentions. However, in that case the court found defense counsel was deficient because the attorney's strategy of the case was to not object to any line of questioning by the prosecutor. In this matter, there is no evidence in the record that defense counsel was operating in a manner similar to the defense attorney in *Wolf*. The district court determined that trial counsel's lack of objection fell into tactical and strategic decision making, and thus, did not establish counsel was ineffective. Grove has failed to establish that trial counsel was deficient for failing to object to the questions regarding Ativan. Further, Grove has not shown that had the testimony not been elicited, the outcome of the case would have been different. Therefore, the district court did not err in dismissing this claim.

### 2.      Dr. Arden's testimony

Grove asserts trial counsel's performance was deficient during the direct and cross-examination of Dr. Arden at trial. Specifically, Grove claims counsel was deficient because he

failed to: (1) provide iron stain slides to Dr. Arden prior to trial; and (2) object to the impeachment of Dr. Arden and thereafter rehabilitate him.

### a. Iron stains

Grove alleges deficiency in trial counsel's failure to provide Dr. Arden with the iron stain slides, even though Dr. Arden testified that he had asked counsel for them. Trial counsel testified at the evidentiary hearing that he requested recuts for Dr. Arden's review, but not specifically iron stain slides. Mr. Parnes testified that the failure to provide an expert with all relevant information is contrary to reasonable professional norms.

In preparing for the underlying criminal case, Dr. Arden requested a set of all the microscopic slides that were done pursuant to the autopsy, including the brain examination and slides that utilized special stains. At the time of trial, Dr. Arden had copies of all slides, except iron stain slides that were reviewed by Dr. Ross when conducting the autopsy of the body. There were no iron stain slides made of the brain.

Dr. Arden testified at trial as follows:

Q. Did you feel like there was any information that you needed in order to form opinions about this that was not provided to you?
A. No sir. And, in fact, I will tell you that along the course of reviewing materials, one of the things that I felt I needed was the recuts of the slides. They didn't come initially. And so, at that point, I requested them of you; and you, you and the State arranged for them to be provided. So, what I requested I was given.

Dr. Arden further testified that there were abdominal injuries that were forty-eight to seventy-two hours of age and other injuries that were more than a week old. Dr. Arden did review the iron stain slides of the abdomen in preparation for the post-conviction relief evidentiary hearing. At the evidentiary hearing, Dr. Arden testified that examination of the iron stain slides led to the discovery of evidence of additional healed injuries in one of the victim's eyes, his back, and the mesentery in his abdomen. However, Dr. Arden confirmed that his opinion regarding the injuries that led to the victim's death were the same as his opinion presented at trial.

As the district court noted, the existence of injuries older than those which caused the victim's death does not call the verdict into question. Dr. Arden testified that he was adequately prepared and Grove has not shown a reasonable probability that the result would have been different had Dr. Arden reviewed the iron stain slides. Therefore, Grove was not prejudiced by

trial counsel failing to provide iron stain slides to Dr. Arden. The district court did not err in dismissing this claim.

### b. Impeachment of Dr. Arden

Grove alleges deficiency in trial counsel's handling of information available for purposes of impeaching Dr. Arden regarding alleged gross mismanagement when he was the Chief Medical Examiner in Washington, D.C., and failing to rehabilitate Dr. Arden on redirect examination. During cross-examination, the prosecuting attorney questioned Dr. Arden regarding the issues surrounding his departure from employment as Chief Medical Examiner in Washington, D.C. Trial counsel testified at the evidentiary hearing that he was aware of potential impeachment issues with respect to Dr. Arden's employment. Trial counsel stated that he did not object to the prosecutor's attempt to impeach because none of the issues went to Dr. Arden's opinion or his medical abilities. He further explained that he did not feel an objection would make a difference to the opinions presented. Trial counsel testified that in hindsight, it may have been better to present the issue in direct testimony to avoid the appearance of trying to hide the information or file a motion in limine to exclude the evidence. Mr. Parnes testified that trial counsel's failure to object and failure to file a motion in limine were prejudicial and deficient performance.

Trial counsel's decisions on this issue are strategic matters. *See Giles*, 125 Idaho at 924, 877 P.2d at 368 ("[C]ounsel's choice of witnesses, manner of cross-examination, and lack of objection to testimony fall within the area of tactical, or strategic, decisions, as does counsel's presentation of medical evidence."). "[S]trategic and tactical decisions will not be second guessed or serve as a basis for post-conviction relief under a claim of ineffective assistance of counsel unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review." *Pratt v. State*, 134 Idaho 581, 584, 6 P.3d 831, 834 (2000). Grove has presented no evidence suggesting that these decisions were the product of inadequate preparation or another shortcoming capable of objective review. On the contrary, trial counsel testified that he was aware of the allegations made against Dr. Arden during the course of his prior employment through conversations with Dr. Arden and his own research on Dr. Arden's background. He also acknowledged that he assumed the prosecuting attorney was aware of the allegations as well. Trial counsel determined that the testimony was innocuous. Further, the evidence that Dr. Arden was forced to change

career paths due to mismanagement was admissible for purposes of impeachment in this case; it calls into question the witness's credibility. Grove has not shown that the outcome of the case would have been different but for the impeachment of Dr. Arden.

Finally, Grove asserts deficiency in trial counsel's failing to object to the prosecuting attorney's question regarding whether Dr. Arden was on "a special mission" to help Grove. Trial counsel testified at the evidentiary hearing that he could not recall why he did not object to the State characterizing Dr. Arden as being on a special mission, but he was certain Dr. Arden was not going to tell the jury he was on a mission. Mr. Parnes testified that the questioning was objectionable.

It was neither deficient nor prejudicial for trial counsel to conclude that allowing Dr. Arden to answer and affirmatively state that he had fully cooperated with the prosecutor's office was more effective than objecting. Because the central point of the question was valid and the witness explained why the characterization was unfair, there was no prejudicial effect. Therefore, the district court did not err in dismissing this claim.

### 3. Closing argument

Grove alleges deficiency by trial counsel not objecting to and moving for a mistrial based on prosecutorial misconduct in closing and rebuttal argument. At the evidentiary hearing, trial counsel testified that he did object once to statements made by the prosecutor during the closing statement. Further, that when trial counsel made his closing statement, he responded to the State's theory of the case and explained where the State failed to meet its burden of proving the evidence beyond a reasonable doubt. Mr. Parnes testified that in his opinion trial counsel should have objected to the statements made by the prosecuting attorney. Mr. Parnes opined that because trial counsel did not have an explanation as to why he did not object to the statements, there was no tactical or strategic reasoning employed during the closing arguments. The district court concluded that the decision to not object to certain argument was strategic, and there was no prejudice from lack of an objection. The district court further concluded that none of the allegedly objectionable arguments rose to the level of being sufficiently egregious that the constitution required counsel to object.

Grove first contends that the district court erred when it did not find trial counsel ineffective for not objecting when the prosecutor used the phrase "long-term" in characterizing the defense's position on when K.M.'s injuries occurred. In context, the prosecutor drew a

distinction between the State's evidence showing K.M. would have immediately suffered debilitating pain and been unable to function after being injured while "the defense would have you believe" that K.M.'s symptoms of not feeling well and vomiting the night before he was rushed to the emergency room were the "result of some long-term brain injury." In the context of the evidence at trial, the jury was well aware of the timeframes of the injuries as advanced by the defense being more remote from the victim's death than as advanced by the State.

Grove next argues that it was objectionable when the prosecutor referenced other incidents of children being killed by caretakers. During closing, trial counsel argued that the State's theory "makes no sense" because the State would

> have to believe that between 7:54 and 8:30 that morning, this young man, who loved this child, played with this child, treated him as his own, the child thought of him as a father, no indication of any problems whatsoever at any time, decided in that half hour, bang, I'm going to beat this kid.

The prosecutor responded to this argument in rebuttal by asserting that the State's position was not that Grove simply decided to beat K.M., but that he beat K.M. in a "fit of [fury]." He agreed with trial counsel that "every crime like this is senseless," but that "doesn't mean it doesn't happen." Relying on the jurors' "life experiences," "knowledge," and "common sense," the prosecutor argued that parents and caretakers do kill children, citing examples that had recently been in the news.

Grove also argues that trial counsel's performance was deficient in not objecting to the prosecutor's comment in argument about Dr. Ross's "unenviable task of taking [K.M.]'s body apart piece by piece to determine, to the best of his ability, what had happened." The challenged statement was made in the context of pointing out that the State's experts either treated K.M. before his death or directly examined his body shortly thereafter.

Grove next claims the district court erred in relation to a comment in closing argument about a murderer going free. To put the comment into context, during closing argument, trial counsel argued that the beyond a reasonable doubt standard protected the jury from thinking they might have convicted someone who is not guilty. The prosecutor responded by talking about the standard and included the argument, "We do not want to convict an innocent man. But at the same time, we don't want to let a murderer go free."

Finally, Grove argues that trial counsel was ineffective for not objecting to the prosecutor's rebuttal argument regarding Grove's emotions. During closing argument, trial

28

counsel argued that cross-examination of Grove "about having a breakdown last Friday" "has nothing to do with anything, other than get at the man." The prosecutor denied that he was "[t]rying to attack the defendant," and argued that the evidence showed two emotional breakdowns, one at the time the defendant beat K.M. and the other when he was to testify about what happened, and also an "emotional overload" when telling his family that K.M. was injured in a fall from a countertop. Specifically, the prosecutor argued: "The reason for it is the State believes that he had an emotional breakdown, an instantaneous fit of anger, that morning that resulted in these injuries to . . . [K.M.]."

> The right to effective assistance extends to closing arguments. *See Bell v. Cone*, 535 U.S. 685, 701-02 [122 S. Ct. 1843, 1853-54, 152 L.Ed.2d 914, 931] (2002); *Herring v. New York*, 422 U.S. 853, 865 [95 S. Ct. 2550, 2556–57, 45 L.Ed.2d 593, 602] (1975). Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," *Herring*, 422 U.S. at 862 [95 S. Ct. at 2555, 45 L.Ed.2d at 600], but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. *See Bell*, 535 U.S. at 701-02 [122 S. Ct. at 1863-54, 152 L.Ed.2d at 931]. Judicial review of a defense attorney's summation is therefore highly deferential . . . . *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4, 157 L.Ed.2d 1, 7-8 (2003).

*State v. Abdullah*, 158 Idaho 386, 508, 348 P.3d 1, 123 (2014).

The district court did not err in finding that decisions made by trial counsel during closing arguments "fell within the wide range of reasonable professional assistance," and that there was no prejudice. "[A]bsent egregious misstatements, the failure to object during closing argument and opening statement is within the wide range of permissible professional legal conduct." *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013). The district court correctly concluded that the prosecutor's statements, taken in context, did not rise to the level of egregious. Further, the district court correctly concluded that Grove failed to prove prejudice and that there is no reasonable probability that the outcome of the case would have been different had trial counsel objected. Therefore, the district court did not err in dismissing this claim.

### 4. Cumulative effect

Finally, the district court correctly rejected Grove's argument that there was cumulative prejudice.

### III.
### CONCLUSION

The judgment dismissing, in part and denying in part, Grove's petition for post-conviction relief is affirmed.

Judge GUTIERREZ and Judge MELANSON **CONCUR**.